In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 06-3312

CHARLES J. GRIFFIN AND JULIA A. YARDEN,

*Plaintiffs-Appellants,*

*v.*

SISTERS OF SAINT FRANCIS, INC.,

*Defendant-Appellee.*

---

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 02 C 329—**Richard L. Young**, *Judge.*

---

ARGUED APRIL 17, 2007—DECIDED JUNE 6, 2007

---

Before KANNE, WOOD, and EVANS, *Circuit Judges.*

PER CURIAM. Charles Griffin and Julia Yarden were fired from their jobs at Michaela Farm in Oldenburg, Indiana. The farm is owned and run by the Sisters of Saint Francis ("SOSF"), an order of Catholic nuns. Griffin, who had worked on the farm for nearly four years, and Yarden, who had been there for just a few months, believed that they were terminated because Yarden was pregnant, and they sued SOSF under the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k) ("PDA"). They lost on summary judgment, and on appeal, Griffin and Yarden—who proceed *pro se*—argue that they provided

ample evidence that their supervisor knew of Yarden's pregnancy, fired the couple for that reason, and offered pretextual reasons for the decisions. For the reasons that follow, we affirm the judgment of the district court.

**I.**

Griffin began living and working at Michaela Farm in December 1996 and became Farm Manager the following year. In addition to doing general farm work, Griffin planned the farm's planting and harvesting, purchased farm equipment, and oversaw the interns who began working on the farm in 1998. He was hired and supervised by the director of the farm, Sister Anita Brelage.

In early 1999, Griffin met Yarden, a volunteer at the farm, and the two began dating. Shortly thereafter, in May 1999, Sister Carol Ann Sundermann told Brelage that she had heard that Yarden was pregnant. Brelage approached Griffin and asked if that was true; he replied that Yarden was not pregnant. The plaintiffs allege that Brelage told them that an out-of-wedlock pregnancy would be disastrous for the farm. Yarden in fact had become pregnant around that time but suffered a miscarriage. She did not tell Brelage or anyone else at the farm about that pregnancy until August 2000.

A few times in 1999 and 2000, Brelage approached Griffin and Yarden about what she perceived as the couple's lack of discretion and its effect on the morale of other workers at the farm. She emphasized the importance of their being "discreet" in their personal relationship. When Griffin challenged Brelage to explain what she meant, she replied that, for example, driving the tractor around the farm with Yarden on his lap, as she had seen him do, was not discreet. In June 2000, Brelage encountered Yarden outside Griffin's apartment on the

farm some time after 10 p.m., and once again she asked the couple to be more discreet. She explained that the farm was under scrutiny because neighbors had complained to the Archdiocese about certain activities on the farm such as Tai Chi lessons and "hippies" working on a construction project. Brelage feared that the Archdiocese would shut down the farm if it learned, from more complaints from people in the community, that behavior contrary to Roman Catholic teachings occurred on the farm. She noted that Griffin would be out of job if that happened. Yarden perceived this statement as a threat to fire Griffin because of his relationship with her.

Griffin also came under scrutiny for his treatment of the interns he was charged with training and supervising. In 1999 and 2000, four female interns spoke to Brelage about Griffin. They complained that Griffin treated male and female interns differently in work assignments and reported that he inappropriately touched and made sexual comments to female interns. After one such complaint, Brelage asked Griffin to get a psychological evaluation. Griffin complied, and the psychologist reported back that Griffin did not intend any sexual harassment and was not a threat to other workers. At a staff meeting in May 2000, one intern proclaimed that she would leave the farm if Griffin stayed. When it was clear that Griffin wasn't leaving, she quit. After this incident, Griffin complained to Brelage that she had not stuck up for him at the meeting. Brelage informed Griffin that other staff members were questioning her leadership because she continued to support him. Shortly thereafter, the farm's "core staff" decided to suspend the intern program.

Despite what appeared to be ongoing tension between Brelage and Griffin and Yarden, in June 2000 Brelage acceded to Griffin's suggestion that she hire Yarden. Yarden was offered a part-time position (16 hours per week) to begin with a 90-day trial period. Yarden's pri-

mary responsibility was to market the farm's organic produce to restaurants and stores. Yarden began her job on June 3, 2000. A short time later, she and Griffin announced their engagement at a farm banquet.

Later in the summer, Griffin and Yarden were both fired. On August 15, 2000, Griffin dropped by Brelage's office unannounced to discuss whether she was upset with him. The two spoke about Brelage's concerns about the farm's direction, including the intern program, which recently had been discontinued as a result of problems with retaining the interns. Brelage told Griffin that she was uncomfortable hosting female interns on the farm. Although she had not planned to fire Griffin before this meeting, Brelage agreed with Griffin when he suggested that she did not want him around anymore. Griffin then stated that he wanted severance pay if he left the farm. Brelage agreed. Griffin also stated that he wanted it clear for the record that he had not quit. Brelage told him that she would record his separation from the farm as a termination effective on August 16.

Brelage called an emergency meeting of the farm's core staff on the evening of August 15. She related her conversation with Griffin, and the staff members unanimously supported her decision to terminate Griffin. The following day, Griffin and Yarden met (together) with Brelage. Griffin asked Sister Brelage why he was being fired, and she repeated her concern that she could not have a meaningful internship program on the farm as long as she felt uncomfortable with Griffin supervising female interns. Brelage also told Yarden that she was fired because her services were no longer needed at the farm. Yarden then told Brelage that she had had a miscarriage two weeks earlier. This was the first time Yarden had mentioned her pregnancy to Brelage, who "had not observed that Ms. Yarden was pregnant at any time in 2000." Yarden then informed Brelage for the first time that she also had a miscarriage in 1999.

Griffin challenged his termination through an internal grievance process, and his termination was upheld by Brelage's superiors. He also sought unemployment benefits. In the context of proceedings on that claim, an administrative law judge concluded that Griffin had been terminated without "just cause" within the meaning of Indiana Code § 22-4-15-1(d).

After exhausting their administrative remedies, Griffin and Yarden filed a multicount complaint against SOSF in federal district court. They claimed that they had been discriminated against on the basis of religion and sex and brought state-law claims of breach of contract and intentional infliction of emotional distress. They later amended their complaint to include a claim of discrimination based on pregnancy in violation of the PDA. They asserted that SOSF fired both of them "for the sole reason that Plaintiff Yarden was pregnant out-of-wedlock with Plaintiff Griffin's child."

The district court granted summary judgment for SOSF on the pregnancy-discrimination claim, which is the only subject of this appeal. Although SOSF argued that Griffin's claim failed because he was not protected by the PDA, the district court assumed for purposes of its decision that he could assert a claim as someone "who was treated differently 'because of pregnancy.'" But, the court determined, Griffin and Yarden could not make out a prima facie case of discrimination because they did not present evidence that similarly situated coworkers were treated more favorably. The court also concluded that the reasons SOSF gave for firing the two—that Griffin had "relational difficulties" with other employees and that Yarden's services were no longer needed—were not pretextual.

## II.

On appeal, Yarden and Griffin argue that the district court's decision was erroneous, primarily because, in their view, SOSF has not supported its stated reasons for firing them, and the reasons therefore are pretext for unlawful discrimination. They also challenge the district court's conclusion that they did not make out a prima facie case of discrimination; they assert that numerous similarly situated employees were treated more favorably. SOSF of course defends the district court's conclusion that the plaintiffs neither made out a prima facie case of discrimination nor established pretext. However, SOSF also continues to press its argument that Griffin's claim fails as a matter of law because, under the facts of this case, he is not protected by the PDA. The plaintiffs disagree; they assert that the PDA protects men and women equally against discrimination for exercising their "reproductive rights." Because we have not had occasion to decide whether a male plaintiff can state an employment discrimination claim based on an adverse employment action allegedly taken because of a partner's pregnancy, and because there is no need to analyze Griffin's claim any further if it fails as a matter of law, we address this issue before turning to the parties' other arguments.

The PDA amends Title VII to define discrimination "because of sex" to include discrimination "because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k). The statute further states that "*women* affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work." *Id.* (emphasis added). We have described the PDA as a statute that "brought discrimination based on pregnancy within a *woman's* protections against sex discrimination." *Hunt-Golliday v. Metro. Water Reclamation Dist.*, 104 F.3d

1004, 1010 (7th Cir. 1997) (emphasis added); *see Dormeyer v. Comerica Bank-Illinois*, 223 F.3d 579, 583 (7th Cir. 2001) (explaining that the PDA forbids "discrimination against an employee on account of her being pregnant"); *Maldonado v. U.S. Bank,* 186 F.3d 759, 762 (7th Cir. 1999) ("Congress amended Title VII in 1978 to explicitly extend protection to pregnant women."). Other courts likewise have characterized the PDA as a statute recognizing, in effect, that pregnancy is a proxy for gender and, therefore, discrimination against pregnancy is discrimination against women. *See, e.g.*, *Armindo v. Padlocker, Inc.*, 209 F.3d 1319, 1320 (11th Cir. 2000) ("The analysis required for a pregnancy discrimination claim is the same type of analysis used in other Title VII sex-discrimination suits."); *Urbana v. Cont'l Airlines*, 138 F.3d 204, 208 n.2 (5th Cir. 1998) ("The PDA merely specifies that under Title VII an employer must not discriminate on the basis of a woman's pregnancy.").

That is not to say that all claims relating to pregnancy must be brought by women, but male plaintiffs, like their female counterparts, must prove that they suffered adverse employment actions because of their sex. For example, male plaintiffs who challenged an employee-benefits plan that afforded greater benefits to female employees who became pregnant than to the pregnant wives of male employees prevailed under Title VII because the policy discriminated against men. *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 676 (1983) ("[P]etitioner's plan is unlawful, because the protection it affords to married male employees is less comprehensive than the protection it affords to married female employees."). In this case, however, Griffin does not assert that he was fired because of his sex.

Instead, the plaintiffs argue that the PDA prohibits employers from taking "any negative employment action based on reproductive rights" and protects females and

males equally. This interpretation, however, lacks support, and it ignores that pregnancy discrimination is, by statutory definition, discrimination "because of sex," not sexual activity or reproductive capacity. *See Saks v. Franklin Covey Co.*, 316 F.3d 337, 345 (2d Cir. 2003) ("Because reproductive capacity is common to both men and women, we do not read the PDA as introducing a completely new classification of prohibited discrimination based solely on reproductive capacity. Rather, the PDA requires that pregnancy, and related conditions, be properly recognized as sex-based characteristics *of women*.") (emphasis added); *Piantanda v. Wyman Ctr., Inc.*, 116 F.3d 340, 342 (8th Cir. 1997) (explaining that PDA's protection does not extend to "gender-neutral status potentially possessible by all employees").

The plaintiffs' interpretation also ignores the history of the PDA. In 1976, the Supreme Court held that Title VII's prohibition of discrimination based on sex did not extend to pregnancy. *General Electric Co. v. Gilbert*, 429 U.S. 125 (1976). Its conclusion rested in part on the premise that not every classification based on pregnancy is a sex-based classification. *See Newport News*, 462 U.S. at 677 n.12. Congress quickly responded by passing the PDA. The Court has since recognized the PDA as an explicit repudiation of "both the holding and reasoning" of *Gilbert*. *See id.* at 678. The Court went on to state that the PDA "has now made clear that, for all Title VII purposes, discrimination based on a woman's pregnancy is, on its face, discrimination because of her sex." *Id.* at 684. The plaintiffs do not allege that Griffin was fired because of his sex, and so his claim fails.

Because Griffin does not state a claim under the PDA, we address the district court's decision on summary judgment only as it applies to Yarden. As with other Title VII claims, the plaintiff may prove discrimination through either the direct or the indirect method. *Miller v. Am.*

*Fam. Mut. Ins. Co.*, 203 F.3d 997, 1004-05 (7th Cir. 2000). Yarden pursued both paths in the district court but now concedes that "the evidence offered under the direct evidence method did not meet the requirements" of establishing discriminatory animus. She argues, however, that the district court reached the wrong conclusion under the indirect method, which requires her to prove that: (1) she was pregnant and her employer knew she was pregnant; (2) she was performing her duties satisfactorily; (3) she was fired; and (4) similarly situated employees not in the protected class were treated more favorably. *Clay v. Holy Cross Hosp.*, 253 F.3d 1000, 1005 (7th Cir. 2001). If Yarden makes out a prima facie case, the burden shifts to SOSF to articulate a legitimate, nondiscriminatory reason for firing her. *Id.* Once such a reason is given, Yarden can survive summary judgment only by showing that the reason is pretext for intentional discrimination. *Id.*

Although the initial prong of the prima facie case generally requires proof that the plaintiff was pregnant and that the employer knew of the pregnancy, the parties gloss over the undisputed fact that Yarden was not pregnant when she was fired on August 16, 2000. There are circumstances under which a pregnancy discrimination claim might be based on an adverse employment action taken against a woman who is not currently pregnant; for example, the PDA protects women from discrimination based on their capacity to become pregnant. *See UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 206 (1991); *Kocak v. Cmty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 469-70 (6th Cir. 2005). But Yarden claims that her termination was due to her pregnancy in the summer of 2000.

We need not resolve the matter, however, because an issue of fact remains as to the first prong because, as the district court concluded, there is a dispute over whether Brelage knew that Yarden had become pregnant. Yarden admits that she did not tell Brelage until after Brelage

fired her. But she asserts that she was visibly pregnant starting in June 2000; she says that she was wearing maternity clothes and "could no longer conceal my second pregnancy by Charles Griffin." And indeed, Yarden miscarried on July 28 at 22 weeks pregnant, so it is possible that her pregnancy was visible. There is also a question as to whether another farm employee, Sister Quinn, told Brelage that Yarden might be pregnant. Quinn asserted that she discussed with Brelage the possibility that Yarden was pregnant, but she could not remember whether that occurred in 1999 or 2000. Nevertheless, Brelage swore that she did not know about the pregnancy until Yarden told her in August 2000. Because of the conflicting testimony on this point, the district court correctly concluded than an issue of fact remained regarding Brelage's knowledge of the pregnancy.

The other point of contention in terms of Yarden's prima facie case is whether she provided evidence that similarly situated employees were treated more favorably than she. Yarden argues that the district court erred in concluding that she had not, because, she asserts, there were "10 female and 12 male employees . . . that had similar work responsibilities and were supervised by the same personnel," and who were "allowed to work full time, and given Yarden's job responsibilities" after she was fired. But there is scant evidence in the record to support Yarden's assertion.

If, however, Yarden's case is viewed as single-discharge or "mini-reduction-in-force" case, she would not be required to point to similarly situated employees. *See Bellaver v. Quanex Corp.*, 200 F.3d 485, 495 (7th Cir. 2000). When an employee in a unique position is terminated and her position is not filled, but employees outside the protected class assume the fired employee's responsibilities, the employer has effectively replaced the employee. *See Michas v. Health Cost Controls of Ill., Inc.,*

209 F.3d 687, 693 (7th Cir. 2000); *Bellaver*, 200 F.3d at 495. To guard against the danger that the employer can hide a discriminatory motive for terminating the employee simply by stating that the job was eliminated, the plaintiff is not required to show that similarly situated employees were treated more favorably. Instead, she needs only to establish that her duties were absorbed by employees outside the protected class. *Michas*, 209 F.3d at 693. Yarden's claim resembles a mini-RIF case because, as far as the record demonstrates, she was uniquely situated among the farm workers[1] and was told she was being fired because her services were no longer needed. But Yarden's claim fails even if she is required to demonstrate only that her responsibilities were taken up by a non-pregnant employee because she does not dispute that marketing to commercial accounts—her primary func-tion—ceased after her termination. She stated in her deposition that the farm "discontinued all commercial accounts . . . upon [her] firing" and that she had to inform her customers that "there was going to be no more service."

Finally, Yarden challenges the district court's decision that she did not establish that the reason SOSF gave for firing her was pretextual. Although we do not believe she made out a prima facie case, we address her argument in the interest of completeness. An employer's proffered reason for a termination is pretextual if it is not the true ground. *Forrester v. Rauland-Borg Co.*, 453 F.3d 416, 417 (7th Cir. 2006). Yarden asserts that SOSF's reason for firing her—that her services no longer were needed—cannot be bona fide because, although she was hired for "commercial account development," she was

---

[1] For example, it appears that only Yarden was working part time and completing a 90-day trial period. And only Yarden was charged with marketing the farm's goods to local businesses.

occupied with general farm work in the summer of 2000, and that work continued after her termination. But, again, Yarden admitted that corporate marketing ceased after her departure, although the farm's community sponsored agriculture program and its booth at the local farmers' market continued to operate. Yarden also attempted to demonstrate pretext by showing that the farm lost money as a result of the decision to fire her and Griffin. However, "the question is never whether the employer was mistaken, cruel, unethical, out of his head, or downright irrational in taking the action for the stated reason, but simply whether the stated reason was his reason." *Id.* Whether Yarden's discharge was smart or advisable has no bearing on the pretext inquiry.

## III.

Because Griffin's claim is untenable and Yarden has not supplied sufficient evidence from which a finder of fact could infer that she was terminated for becoming pregnant, we AFFIRM the grant of summary judgment for SOSF.

A true Copy:

    Teste:

 

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*