In the

# United States Court of Appeals
## For the Seventh Circuit

―――――――――

No. 06-3684

CHERYL HALL,

*Plaintiff-Appellant,*

*v.*

NALCO COMPANY,
formerly known as
ONDEO NALCO COMPANY,
a Delaware corporation,

*Defendant-Appellee.*

―――――――――

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 C 7294—**David H. Coar**, *Judge.*

―――――――――

ARGUED JUNE 4, 2007—DECIDED JULY 16, 2008

―――――――――

Before RIPPLE, ROVNER, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* Cheryl Hall maintains she was
fired by Nalco Company for taking time off from work
to undergo in vitro fertilization after being diagnosed
with infertility. She filed this suit under Title VII of the
Civil Rights Act of 1964, as amended by the Pregnancy
Discrimination Act ("PDA"), alleging her termination
constituted discrimination on the basis of sex. Without
reaching the merits of her claim, the district court granted

summary judgment for Nalco on the ground that Hall could not prove sex discrimination because infertility is a gender-neutral condition.

We reverse. The focus of any Title VII sex-discrimination claim is whether the employer treated the employee differently because of the employee's sex. The PDA amended Title VII to provide that discrimination "because of" sex includes discrimination "because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k). Although infertility affects both men and women, Hall claims she was terminated for undergoing a medical procedure—a particular form of surgical impregnation—performed only on women on account of their childbearing capacity. Because adverse employment actions taken on account of childbearing capacity affect only women, Hall has stated a cognizable sex-discrimination claim under the language of the PDA.

## I.  Background

Hall was hired by Nalco in 1997 and in April 2000 took on the role of sales secretary. In that position Hall reported to Marv Baldwin, a district sales manager in the Chicago-area office in which she was employed. In March 2003 Hall requested a leave of absence to undergo in vitro fertilization ("IVF"). IVF is an assisted reproductive technology that involves administration of fertility drugs to the woman, surgical extraction of her eggs, fertilization in a laboratory, and surgical implantation of the resulting embryos into the woman's womb. *See The Merck Manual of Medical Information* 1418-19 (Mark H. Beers, MD, et al. eds., 2d home ed. 2003) (describing IVF procedure); *Mayo Clinic Family Health Book* 1069-70 (Scott C. Litin, MD, ed., 3d ed.

2003) (same). Each IVF treatment takes weeks to complete, and multiple treatments are sometimes needed to achieve a successful pregnancy. *Mayo Clinic Family Health Book*, *supra* at 1069-70. Baldwin approved Hall's leave from March 24 to April 21. After Hall returned to work, she informed Baldwin she intended to undergo IVF again because the first procedure had been unsuccessful. On or around July 21, she filed for another leave of absence to begin August 18.

In the meantime, in January 2003 Nalco began a reorganization that ultimately led to a decision to consolidate Hall and Baldwin's sales office with another Chicago-area sales office. As part of this consolidation, Nalco decided to keep only one of the two sales secretaries serving those offices. At the end of July 2003, Baldwin told Hall of the consolidation and informed her that only Shana Dwyer, the secretary from the other office, would be retained. Baldwin told Hall her termination "was in [her] best interest due to [her] health condition." Prior to informing Hall of her termination, Baldwin discussed the matter with Jacqueline Bonin, Nalco's employee-relations manager. Bonin documented this conversation; her notes reflect that Hall had "missed a lot of work due to health," and more specifically, in a section relating to Hall's job performance, cite "absenteeism—infertility treatments." Dwyer, the secretary who was retained, was a female employee who since 1988 had been incapable of becoming pregnant.

After her termination Hall filed a timely discrimination charge with the Equal Employment Opportunity Commission and then filed this action against Nalco alleging sex discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2.

Specifically, she alleged her termination violated the Pregnancy Discrimination Act, which amended Title VII to state that discrimination "because of sex" includes discrimination "because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k). Hall alleged she was fired on account of being "a member of a protected class, female with a pregnancy related condition, infertility." Without addressing the merits of Hall's claim, the district court granted summary judgment for Nalco on the ground that infertile women are not a protected class under the PDA because infertility is a gender-neutral condition. Hall appealed.

## II. Discussion

We review de novo a district court's grant of summary judgment, viewing the evidence in the light most favorable to the nonmoving party. *Healy v. City of Chicago*, 450 F.3d 732, 738 (7th Cir. 2006). Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The district court did not address whether the case presented a material factual dispute; instead, the court concluded Hall's allegations did not amount to discrimination "because of or on the basis of pregnancy, childbirth, or related medical conditions." We are presented, then, with a threshold legal question of whether Hall has stated a cognizable Title VII claim.

Whether allegations of the type Hall has made state a claim for relief under Title VII is an issue of first impres-

sion in this circuit; we are also unaware that any other circuit has addressed the precise question presented here. Title VII makes it unlawful for an employer to discharge or otherwise discriminate against an employee in the terms and conditions of employment "because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(2). In 1978 the Pregnancy Discrimination Act, Pub. L. No. 95-555, 92 Stat. 2076 (1978), amended Title VII to include the following definitional provision:

> The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work, and nothing in section 2000e-2(h) of this title shall be interpreted to permit otherwise.

42 U.S.C. § 2000e(k). The PDA was enacted to overrule the Supreme Court's decision in *General Electric Co. v. Gilbert,* 429 U.S. 125 (1976), which had held that excluding pregnancy from a list of nonoccupational disabilities covered by an employer's disability benefits plan did not amount to discrimination on the basis of sex. *See Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 676-78 (1983).

The PDA created no new rights or remedies, but clarified the scope of Title VII by recognizing certain inherently gender-specific characteristics that may not form the basis for disparate treatment of employees. *Id.* at 678-79. "[T]he simple test" in any Title VII sex-discrimination claim is

whether the employer action in question treats an employee "in a manner which but for that person's sex would be different." *City of L.A., Dep't of Water & Power v. Manhart*, 435 U.S. 702, 711 (1978). The enactment of the PDA did not change this basic approach. *Newport News*, 462 U.S. at 683-85. The PDA "made clear that, for all Title VII purposes, discrimination based on a woman's pregnancy is, on its face, discrimination because of her sex." *Id.* at 684. The same is true for disparate treatment based on childbirth and medical conditions related to pregnancy or childbirth. *See* 42 U.S.C. § 2000e(k) (discrimination "because of sex" includes discrimination "because of or on the basis of pregnancy, childbirth, or related medical conditions").

The district court concluded that Hall's allegations do not state a Title VII claim because infertility is a gender-neutral condition entitled to no protection under the language of the PDA. In reaching this conclusion, the court relied primarily on two cases from other circuits holding that the PDA does not require employer insurance policies to cover infertility treatment so long as both male and female treatments are excluded. *See Saks v. Franklin Covey Co.*, 316 F.3d 337, 345 (2d Cir. 2003) ("Because reproductive capacity is common to both men and women, we do not read the PDA as introducing a completely new classification of prohibited discrimination based solely on reproductive capacity."); *Krauel v. Iowa Methodist Med. Ctr.*, 95 F.3d 674, 680 (8th Cir. 1996) ("[B]ecause the policy of denying insurance benefits for treatment of fertility problems applies to both female and male workers and thus is gender-neutral," it does not violate the PDA.).

Both *Saks* and *Krauel* distinguished the Supreme Court's decision in *International Union v. Johnson Controls, Inc.*, 499

U.S. 187 (1991), an important case concerning the scope and proper interpretation of the PDA. At issue in *Johnson Controls* was an employer policy that barred all fertile women from jobs involving lead exposure because of its potentially damaging effect on fertility and the fetus. The Court held the policy was invalid under the PDA because it "classifie[d] on the basis of gender and childbearing capacity, *rather than fertility alone*." *Id.* at 198 (emphasis added). Implicit in this holding is that classifications based on "fertility alone"—and by like implication, infertility alone—are not prohibited by the PDA, which reaches only gender-specific classifications.[1] As the

---

[1] Notably, this understanding of *Johnson Controls* rests on the fact that infertility is gender neutral, not on Nalco's alternative argument that the PDA only applies postconception. *Cf. Krauel*, 95 F.3d at 679 (infertility is not a related medical condition because "[p]regnancy and childbirth, which occur after conception, are strikingly different from infertility, which prevents conception"). Indeed, this argument (and this aspect of the Eighth Circuit's reasoning in *Krauel*), is specifically foreclosed by *Johnson Controls*, which explicitly recognized the applicability of the PDA to classifications based on "potential for pregnancy," not just actual pregnancy. *Johnson Controls*, 499 U.S. at 199; *see also Griffin v. Sisters of Saint Francis*, 489 F.3d 838, 844 (7th Cir. 2007) ("There are circumstances under which a pregnancy discrimination claim might be based on an adverse employment action taken against a woman who is not currently pregnant . . . ."); *Kocak v. Cmty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 470 (6th Cir. 2005) (holding that a woman cannot be refused employment based on a belief that she intends to become pregnant in the near future); *Walsh v. Nat'l Computer Sys., Inc.*, 332 F.3d 1150, 1160 (8th Cir. 2003)

(continued...)

Second Circuit noted in *Saks*, this conclusion is necessary to reconcile the PDA with Title VII because "[i]ncluding infertility within the PDA's protection as a 'related medical condition[ ]' would result in the anomaly of defining a class that simultaneously includes equal numbers of both sexes and yet is somehow vulnerable to sex discrimination."[2] 316 F.3d at 346.

The district court's emphasis on this issue of "infertility alone" is therefore misplaced in the factual context of this case. As *Johnson Controls* illustrates, even where (in)fertility is at issue, the employer conduct complained of must actually *be gender neutral* to pass muster. *Cf. Newport News*, 462 U.S. at 684-85 ("By making clear that an employer could not discriminate on the basis of an employee's pregnancy, Congress did not erase the original prohibition against discrimination on the basis of an employee's sex."). The employer policy in *Johnson Controls* ran afoul of this mandate because its justification was the effect of lead exposure on fertility—an effect implicating both women and men—yet it barred only fertile women from employment. 499 U.S. at 199. The Court

---

[1] (...continued)
(upholding jury verdict for plaintiff "discriminated against . . . because she is a woman who had been pregnant, had taken a maternity leave, and might become pregnant again").

[2] The Second Circuit was careful to note that its decision did not address the issue before us in this case; the court "expressly decline[d] to consider whether an infertile female employee would be able to state a claim under the PDA or Title VII for adverse employment action taken against her because she has taken numerous sick days in order to undergo surgical impregnation procedures." *Saks*, 316 F.3d at 346 n.4.

concluded that the policy did not classify based on the gender-neutral characteristic of fertility alone, but rather on the gender-specific characteristic of childbearing capacity, or "potential for pregnancy," and was therefore invalid under the PDA. *Id.* at 198-99.

Nalco's conduct, viewed in the light most favorable to Hall, suffers from the same defect as the policy in *Johnson Controls*. Employees terminated for taking time off to undergo IVF—just like those terminated for taking time off to give birth or receive other pregnancy-related care—will always be women. This is necessarily so; IVF is one of several assisted reproductive technologies that involves a surgical impregnation procedure. *See The Merck Manual of Medical Information*, *supra* at 1418-19; *Mayo Clinic Family Health Book*, *supra* at 1069-70. Thus, contrary to the district court's conclusion, Hall was terminated not for the gender-neutral condition of infertility, but rather for the gender-specific quality of childbearing capacity.

Because adverse employment action based on childbearing capacity will always result in "treatment of a person in a manner which but for that person's sex would be different," *Manhart*, 435 U.S. at 711, Hall's allegations present a cognizable claim of sex discrimination under Title VII.[3] *Accord Erickson v. Bd. of Governors of State Colls. & Univs. for Ne. Ill. Univ.*, 911 F. Supp. 316, 320

---

[3] We recognize that our analysis differs from the legal theory set forth in Hall's complaint—that infertile women are a protected class under the language of the PDA. However, "[a] complaint need not identify a legal theory, and specifying an incorrect theory is not fatal" to a plaintiff's claim. *Bartholet v. Reishauer A.G. (Zürich)*, 953 F.2d 1073, 1078 (7th Cir. 1992).

(N.D. Ill. 1995) (discharge of woman for undergoing infertility treatment constitutes discharge because of her capacity to become pregnant, stating a claim under Title VII); *Pacourek v. Inland Steel Co.*, 858 F. Supp. 1393, 1403 (N.D. Ill. 1994) (termination for undergoing IVF violates Title VII because "employers are to treat a woman's medical infertility with neutrality—the same general command of the PDA regarding pregnancy itself").

Nalco alternatively argues that even if Hall's claim is cognizable, she has failed to demonstrate that Nalco's legitimate business reason for terminating her—consolidation of its offices and the elimination of one secretarial position—was pretextual. There is enough here to create a triable issue regarding the reason Hall was terminated. Hall was fired shortly after a failed IVF procedure and just before she was scheduled to undergo a second attempt; her boss, Marv Baldwin, told her that the termination was "in [her] best interest due to [her] health condition." In her notes documenting Hall's termination, Jacqueline Bonin, Nalco's employee-relations manager, wrote that Hall "missed a lot of work due to health," and also noted in a section regarding Hall's job performance, "absenteeism—infertility treatments." This evidence is susceptible of both discriminatory and nondiscriminatory explanations; a jury will have to decide.

Nalco also maintains that the decision to retain Dwyer instead of Hall was actually made by Gordie Hamilton, its regional sales manager, who did not know that Hall was undergoing IVF. There is contrary evidence, however. Baldwin was Hall's boss and a district sales manager; Hamilton testified that district sales managers have the authority to hire and fire, and Baldwin told Hall he made the decision. These and other material factual disputes

(e.g., whether Dwyer was better qualified than Hall) make this case inappropriate for summary judgment.

REVERSED AND REMANDED.