In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-2050

JAMES PATTERSON and LISA M. COFFEY,

*Plaintiffs-Appellants,*

*v.*

INDIANA NEWSPAPERS, INCORPORATED,
an Indiana corporation, publisher of
The Indianapolis Star, owned by
Gannett Co., Inc., a foreign corporation,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 05 CV 881—**Larry J. McKinney**, *Judge.*

ARGUED DECEMBER 2, 2008—DECIDED DECEMBER 8, 2009

Before CUDAHY, FLAUM, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* Lisa Coffey and James Patterson
are former editorial writers at *The Indianapolis Star* who
left the newspaper in 2003 and 2005, respectively. They
departed under very different circumstances, but both

claim they were victims of employment discrimination on the basis of their religion—more specifically, discrimination because they are Christians who believe that homosexual conduct is sinful. Patterson also claims the *Star* discriminated against him because of his race (African-American) and age (he was 51 when he was fired), and retaliated against him for filing a complaint with the Equal Employment Opportunity Commission ("EEOC"). Finally, both plaintiffs assert a state-law claim for negligent infliction of emotional distress. The district court entered summary judgment for the *Star* on all claims, and Coffey and Patterson appealed. We affirm.

## I. Background

We begin with two of the district court's procedural rulings, both of which affect the proper scope of this appeal. The district judge determined that Coffey and Patterson had failed to comply with Local Rule 56.1(b), which requires a party opposing a motion for summary judgment to identify the material facts in dispute and cite to admissible evidence controverting the moving party's evidence. The judge also noted that much of their factual submission was argumentative. Because of this noncompliance with the local rules, the judge enforced Local Rule 56.1(e) and for the most part accepted the *Star*'s factual assertions as undisputed. We have repeatedly held that the district court is within its discretion to strictly enforce compliance with its local rules regarding summary-judgment motions, *Fed. Trade Comm'n v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 633 (7th Cir. 2005), so we likewise accept the *Star*'s version of the

facts. The district court also disregarded affidavits submitted by Coffey and Patterson because they "directly contradict[ed]" their deposition testimony. This, too, was appropriate. *See Beckel v. Wal-Mart Assocs., Inc.*, 301 F.3d 621, 623-24 (7th Cir. 2002). Accordingly, we take the following facts from the *Star*'s summary-judgment submission.

## A. *The Indianapolis Star*

*The Indianapolis Star* is Indiana's largest newspaper and was acquired in 2000 by media giant Gannett. Barbara Henry serves as the *Star*'s president and publisher, which puts her in charge of directing the newspaper's overall operation. In 2003 the *Star* named Dennis Ryerson as editor and vice president. In that capacity he is responsible for newsroom staffing and the content of news articles and editorials. Andrea Neal served as the *Star*'s editorial-page editor until the summer of 2003, when she left the newspaper to become a teacher; she was replaced by Tim Swarens. The editorial-page editor reports to the editor and directs the content of the newspaper's editorials and the columns on its opinion pages. Generally speaking, opinion columns represent the viewpoint of the author; editorials are unsigned and represent the editorial position of the newspaper.

## B. Lisa Coffey's Tenure at the *Star*

Coffey joined the *Star* in 1999. In the beginning she spent three days a week working as a copy editor and two

days a week performing administrative duties for a journalism-intern program. Although she "enjoyed working on the metro desk," she made no secret that she wanted to move to the editorial department. Her efforts paid off in 2002 when the *Star* exchanged her copy-editor responsibilities for an editorial-writer position. As an editorial writer, Coffey reported to the editorial-page editor and was responsible for writing editorials and columns for the *Star*'s opinion page. She still spent two days a week administering the *Star*'s intern program, however.

Coffey describes herself as a "traditional Christian" who believes homosexual conduct is sinful. In July 2003, in response to the Supreme Court's decision in *Lawrence v. Texas*, 539 U.S. 558 (2003), Coffey wrote an opinion column describing the HIV risks associated with sodomy. Neal approved the article, but Ryerson decided it was unsuitable for publication because it provided a too-graphic description of anal intercourse. He told Neal, however, that he was open to publishing a less-graphic column on the risks of unprotected sex.

The day after Ryerson rejected Coffey's column, a member of the Christian Student Foundation emailed Ryerson expressing his opinion against same-sex marriage. Ryerson sent a responsive email asking if the *Star* could consider the student's letter for publication; Ryerson copied Coffey on this reply. The electronic correspondence between Ryerson and the student—by all accounts unrelated to Ryerson's refusal to publish Coffey's column—triggered an email exchange between

Coffey and Ryerson about the relationship between objective truth and opinion. Coffey emailed Ryerson stating that she knew both were "seeking truth" even though they held "certain beliefs that are 180 degrees apart." She apologized for being angry with Ryerson (presumably over the rejected column) and invited him to lunch. Ryerson wrote back thanking Coffey, offering to discuss the issue over lunch, and explaining that he did not necessarily believe there is "one truth" and that editorials express "opinion" and not "truth." About an hour later, Coffey replied with a lengthy email describing her religious views. She explained that she had been "knocked out by the Holy Spirit" and said that if Ryerson's perspective was correct, he should "call the nut farm now to haul [her] away." Ryerson perceived Coffey's email as an attempt at workplace proselytization in violation of company policy. Concerned that Coffey might have sent similar emails to other employees of the newspaper, Ryerson wrote back telling Coffey that it was inappropriate to proselytize at work.

Before and after these events, management at the *Star* became aware that Coffey had developed a habit of violating the newspaper's overtime policy. The *Star* required employees to seek preapproval before working any overtime, but Coffey would regularly submit requests for payment for overtime work that had not been preapproved. The issue came to a head in August 2003 when Coffey asked to meet with Ali Zoibi, the *Star*'s vice president of human resources. Coffey requested the meeting to discuss the overtime issue and her pension. Regarding the latter, Coffey claimed that her *Star* pension

account did not reflect extra compensation she had been paid by the sponsor of the internship program Coffey helped manage. The *Star* ended up paying Coffey's pension account an additional $5,500 to reflect the outside compensation. Zoibi took the opportunity, however, to remind Coffey about the importance of following the company's overtime policy.

Coffey disregarded this warning and continued to work overtime without seeking prior approval. Her supervisors considered the extra work to be both excessive and unnecessary. For example, she submitted a request for 50 hours of unapproved overtime work she had performed preparing binders on candidates for election. Coffey had produced far more information than Swarens thought was necessary, and he never would have authorized the request had it been submitted for preapproval because it came close to consuming the entire annual overtime budget for the editorial department. Zoibi and Henry met and agreed that Coffey needed to be supervised more closely to ensure she did not work unauthorized overtime.

In the meantime, in September 2003 Ryerson decided to adjust Coffey's role at the *Star*. Because the aspiring journalists in the newspaper's internship program had more regular contact with newsroom reporting staff than with editorial writers, Ryerson believed the administrative oversight for the program should be shifted from the editorial department to the newsroom. This reorganization left Coffey with only three days of work per week as an editorial writer. Ryerson offered

Coffey a full-time job back on the copy desk. In addition to providing her with a full-time position, the copy-desk job would permit the newspaper to more closely supervise Coffey's work to ensure she did not violate the company's overtime policy. Coffey preferred editorial writing and asked if she could divide her week by working three days as an editorial writer and two days as a copy editor. Ryerson rejected this request as a matter of policy; he believed the news and editorial operations at the newspaper needed to remain separate.

Rather than take the full-time copy-desk job, Coffey resigned. On her last day at the *Star* in October 2003, Coffey sent an email to Henry thanking her for "the privilege of working here at THE STAR. I have enjoyed and appreciated it more than I can say."

### C.  James Patterson's Tenure at the *Star*

Patterson joined the *Star* as an editorial writer in 1995. He is African-American and like Coffey describes himself as a "traditional Christian" who considers homosexual conduct to be sinful. Before Ryerson became the *Star*'s editor in 2003, Patterson had a mixed employment history at the newspaper. Although he received various awards and had generally acceptable performance reviews, there were recurring problems with his writing. Patterson required more editing than any other editorial writer on the *Star*'s staff, and his work also suffered from research and organizational problems. The newspaper hired a writing consultant to review Patterson's

editorials and columns; the consultant confirmed the deficiencies in Patterson's work.

In 2003, after the start of the Iraq war, Patterson submitted an editorial asking the newspaper's readers to pray for American troops. Neal revised the editorial slightly and added a prayer at the end, and the editorial ran in the newspaper on March 20, 2003. After its publication, however, Ryerson—who had just joined the *Star*—told Neal that he was uncomfortable with an editorial telling readers to engage in religious practices. Patterson claims that after this point if he submitted any religious-based opinion pieces that differed from Ryerson's viewpoint, the articles would not be published, although he does not say how often this occurred.

Swarens replaced Neal as editorial-page editor in August 2003, becoming Patterson's immediate supervisor. He immediately noted the frequent and substantial problems with Patterson's writing. First, Patterson's pieces required more editing than any other editorial writer's. Swarens also noticed regular errors in Patterson's work ranging from misspellings to more serious reporting mistakes. For example, Patterson wrote an editorial endorsing City-County Council candidate "Vernon Smith," but the candidate's name was Vernon Brown. He wrote an editorial recalling President John F. Kennedy's assassination 30 years earlier, but the assassination was 40 years earlier. He wrote an editorial in February 2004 stating that Governor O'Bannon had accepted the resignation of the state commissioner of motor vehicles; in fact, Governor O'Bannon had died five months earlier and the commissioner in question had not resigned.

While many of Patterson's mistakes were caught in the editing process, some made it into the newspaper and the *Star* had to print corrections. For example, on May 21, 2004, the *Star* published an editorial Patterson had written criticizing the sufficiency of the Indianapolis Humane Society's financial disclosures. In fact, the Humane Society's annual report contained extensive and detailed information about the Society's financial status, and the *Star* had to print a retraction. When confronted about the problems with his work, Patterson generally refused to take responsibility for his mistakes. He minimized their significance or claimed that the errors were caused by the pressures of additional work Swarens had assigned to him.

Although the parties disagreed about the severity of and reasons for Patterson's writing and reporting errors, by July 2004 Swarens had concluded that the recurring nature of the problem warranted placing Patterson on a Performance Improvement Plan. Under a Performance Improvement Plan, an employee is given a plan for improvement and placed on a warning system. An early failure to improve will receive a written warning. If improvement is shown, the employee will be kept at this first level of the performance plan; if improvement is not shown, however, a final written warning will be issued. If the employee's performance does not meet the expectations of the plan after this final written warning, the employee is terminated. Patterson believed the *Star*'s decision to place him on a Performance Improvement Plan was motivated by an illegal discriminatory

purpose; in August 2004 he filed an EEOC charge that the EEOC dismissed in March 2005.

The *Star* gave Patterson approximately ten months to meet the goals of the improvement plan. Patterson did not, however, reduce his writing errors and reporting mistakes to the *Star*'s satisfaction. Between July and November 2004, Swarens kept Patterson at the written-warning level of the improvement plan. But in November and December 2004, Patterson's performance deteriorated dramatically. Two of his editorials were laden with serious errors and required printed retractions. One piece incorrectly reported that a proposed bond issue would cause a property-tax increase. The other erroneous article was an even greater cause for concern. Patterson wrote an editorial endorsing AirTran's bid for ATA Airlines without bothering to contact Southwest Airlines, the competing bidder. Swarens viewed this as a serious violation of basic reporting standards as well as a lapse in editorial judgment. The editorial resulted in dozens of reader complaints and forced top *Star* officials to meet with Southwest's CEO to personally apologize for Patterson's reporting mistakes.

Based on these errors, in December 2004 the *Star* escalated Patterson to final-written-warning status. Patterson's performance remained poor, however; he continued to submit editorials with misspelled names and incorrect dates. In light of these continuing errors and based on Swarens's recommendation, on May 3, 2005, the *Star* fired Patterson. At the time of his termination, Patterson was 51 years old.

### D. Proceedings in the District Court

Coffey and Patterson sued Indiana Newspapers, Inc., the publisher of the *Star,* alleging various forms of discrimination. Both brought claims alleging religious discrimination in violation of Title VII of the Civil Rights Act of 1964. *See* 42 U.S.C. § 2000e-2(a)(1). In addition, Patterson alleged that the *Star* discriminated against him on the basis of race in violation of Title VII and claimed the newspaper retaliated against him after he filed his discrimination complaint with the EEOC. Patterson also brought an age-discrimination claim under the Age Discrimination in Employment Act ("ADEA"). *See* 29 U.S.C. § 623(a)(1). Finally, both plaintiffs asserted a state-law claim for negligent infliction of emotional distress.

The *Star* moved for summary judgment on all claims. As we have noted, the district court disregarded much of the plaintiffs' submission in response and accepted the *Star*'s factual assertions as largely undisputed. The court then concluded that neither plaintiff had established a prima facie case of discrimination under any theory and in the alternative held there was no evidence that the *Star*'s employment actions against Coffey or Patterson were pretext for discrimination. The court also rejected Patterson's retaliation claim. Finally, the court held that there was no evidence to support the plaintiffs' claims for negligent infliction of emotional distress. Accordingly, the court entered summary judgment in favor of the *Star.* This appeal followed.

## II. Discussion

We review a district court's grant of summary judgment de novo. *Hall v. Nalco Co.*, 534 F.3d 644, 646 (7th Cir. 2008). Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).

Although Coffey and Patterson left the *Star* nearly 18 months apart and under very different circumstances, their religious-discrimination claims overlap. Both plaintiffs contend that the *Star* engaged in systematic discrimination against "traditional Christians" who hold the religious belief that homosexual conduct is sinful. More specifically, Coffey and Patterson maintain that the *Star*'s top editors—in particular, Ryerson—opposed public or workplace expressions of religion and discriminated against those who were opposed to homosexual conduct as a matter of their religion. The plaintiffs claim that after Ryerson became editor, the *Star* published "hordes of news articles" designed to portray homosexuality in a positive light, "softened" its editorial opposition to same-sex marriage, promoted employees who were homosexuals or "homosexual sympathizers," sought to purge the news and editorial operations of the paper of "traditional Christians," and otherwise exhibited animus toward Christians who opposed homosexual conduct.

Unsurprisingly, the *Star* disagrees. The newspaper notes that its top managers are Christians, and numerous *Star* employees—including at least three members of the

editorial department where Coffey and Patterson worked—share the plaintiffs' religiously motivated opposition to homosexual conduct. The *Star* points out that it has consistently editorialized against same-sex marriage and also has opposed the "ACLU's attempt to ban Christian prayers in state legislative sessions." The *Star* draws our attention to its front-page name-plate, which prominently features a Bible verse. Finally, the *Star* says that its supposedly favorable portrayal of homosexuality in its news columns amounts to nothing more than coverage of topics that are of increasing public interest.

There is no need to resolve these starkly conflicting descriptions of the atmosphere at the *Star*. For reasons we will explain, neither plaintiff has established a prima facie case of employment discrimination on any ground. Patterson's retaliation claim is also woefully insufficient. Finally, there is no evidence to support the plaintiffs' state-law tort claim for negligent infliction of emotional distress.

## A. Discrimination Claims

Coffey and Patterson each claim that the *Star* discriminated against them on the basis of religion in violation of Title VII; Patterson also claims that the *Star* discriminated against him on the basis of his race and age in violation of Title VII and the ADEA. *See* 42 U.S.C. § 2000e-2(a)(1); 29 U.S.C. § 623(a)(1). They rely solely on the indirect burden-shifting method of proof established in

*McDonnell-Douglas v. Green*, 411 U.S. 792, 802-04 (1973).
Under this framework Coffey and Patterson must make
a prima facie case of discrimination by showing that they
(1) belong to a protected class; (2) performed their job
according to the *Star*'s legitimate performance expecta-
tions; (3) suffered an adverse employment action; and
(4) were treated less favorably compared to similarly
situated employees outside of the protected class. *See
Tyson v. Gannett Co.,* 538 F.3d 781, 783 (7th Cir. 2008). If the
plaintiffs establish a prima facie case, then the burden
shifts to the *Star* to set forth a legitimate, nondiscrimina-
tory reason for its employment decisions. *Nichols v. S. Ill.
Univ.-Edwardsville*, 510 F.3d 772, 784-85 (7th Cir. 2007). If
the *Star* makes that showing, the burden shifts back to
Coffey and Patterson to explain why the *Star*'s proffered
justification is pretext for discrimination. *Amrhein v.
Health Care Serv. Corp.*, 546 F.3d 854, 859-60 (7th Cir. 2008).

### 1.   Coffey's Religious-discrimination Claim

As we have noted, Coffey characterizes herself as a
"traditional Christian" who believes homosexuality is
sinful. She claims it was this particular religious belief—
not her Christianity in general—that triggered the *Star*'s
disparate treatment of her. We have previously held that
a plaintiff may proceed on a claim that "her super-
visors, though also Christian, did not like her brand of
Christianity" because "[t]he issue is whether the plain-
tiff's specific religious beliefs were a ground for" an
adverse employment action. *Grossman v. S. Shore Pub. Sch.*

*Dist.*, 507 F.3d 1097, 1098 (7th Cir. 2007). Accordingly, Coffey has established the first element of her prima facie case.

She has also established the third element. We accept that her transfer from editorial writing back to copy editing qualifies as an adverse employment action. We have said that a "'dramatic downward shift in skill level required to perform job responsibilities can rise to the level of an adverse employment action.'" *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996) (quoting *Dahm v. Flynn*, 60 F.3d 253, 257 (7th Cir. 1994)). The *Star* suggests that because the transfer would not have reduced her salary or benefits, Coffey suffered no adverse employment action. But editorial writing is more important than copy editing in the hierarchy of a newspaper, so Coffey's transfer was plainly a demotion even if the salary and benefits were the same.

Coffey runs into trouble, however, on the second and fourth elements of her prima facie case. She cannot show that she met the *Star*'s legitimate performance expectations or that a similarly situated employee who did not share her religious beliefs was treated more favorably. The evidence is undisputed that Coffey repeatedly violated the newspaper's overtime policy, and the *Star*'s decision to transfer her from editorial writing to copy editing was based in part on the newspaper's desire to monitor her more closely (the decision was also prompted by the reallocation of the administrative oversight of the intern program, leaving her with just three days per week as an editorial writer). Coffey

argues at length that Ryerson transferred her because he objected to her religious perspective on homo-sexuality, not because she violated the company's overtime policy. This is essentially a pretext argument, and most of it is premised upon factual assertions that we, like the district court, have disregarded because of the plaintiffs' violation of the local rules and submission of affidavits that contradict their deposition testimony.

To the extent, however, that Coffey is claiming that Ryerson would have permitted someone who did not share her religious views to remain in the editorial depart-ment notwithstanding repeated violations of company rules, the argument is folded into the fourth element of her prima facie case. Coffey's claim founders there as well. Even assuming that Coffey was meeting the *Star*'s legitimate performance expectations, she has failed to establish that the *Star* treated any similarly situated employees more favorably. We have said in this context that similarly situated employees must be "directly comparable" to the plaintiff "in all material respects," *Raymond v. Ameritech Corp.*, 442 F.3d 600, 610-11 (7th Cir. 2006), which includes showing that coworkers engaged in comparable rule or policy violations, *see, e.g.*, *Jordan v. City of Gary, Ind.*, 396 F.3d 825, 834 (7th Cir. 2005). This means that Coffey must identify a comparison employee who held the same job (editorial writer), engaged in the same or comparable misconduct (repeated violations of overtime policy), did not hold her religious beliefs (that homosexual conduct is sinful), and was treated more favorably.

Coffey identifies three employees—Swarens, Beth Murphy, and Jane Lichtenberg—that she claims were similarly situated but treated more favorably. We note first that Swarens was Coffey's supervisor and so cannot be used for comparison purposes; we have previously held that "ordinarily, it will not be the case that a plaintiff is similarly situated to another employee when the plaintiff is subordinate to that employee," *Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006), and Coffey has given us no reason to believe this is an extraordinary case. Although Lichtenberg and Murphy, like Coffey, worked under Swarens in the editorial department, they were copy editors, which Coffey vigorously argues (and we have accepted) is significantly different from the position of editorial writer. But most importantly, there is absolutely nothing in the record to suggest that any of these employees violated the *Star*'s overtime policy—*at all*, much less repeatedly. *See, e.g.*, *id.* (holding that a coworker cannot be similarly situated if they do not commit comparable policy violations). Accordingly, Coffey has failed to establish her prima facie case.

We note for completeness that to the extent Coffey's Title VII claim is based on an allegation that she was constructively discharged, it is exceedingly weak. Constructive-discharge Title VII claims require proof that the employer's discriminatory conduct forced the plaintiff " 'to resign because her working conditions, from the standpoint of a reasonable employee, had become unbearable.' " *Fischer v. Avanade, Inc.*, 519 F.3d 393, 409 (7th Cir. 2008) (quoting *EEOC v. Univ. of Chi. Hosps.*, 276

F.3d 326, 331, (7th Cir. 2002)); *see also Taylor v. W. & S. Life Ins. Co.*, 966 F.2d 1188 (7th Cir. 1992) (recognizing that a jury could find constructive discharge where plaintiffs' boss constantly made racist comments, brandished a pistol, and held it to one plaintiff's head).

It is entirely implausible to suggest that a transfer from editorial writing to copy editing was enough to make Coffey's working conditions "unbearable." Moreover, the evidence that Ryerson refused to publish her editorial on the HIV risks of sodomy and then told her not to proselytize at work hardly establishes that the *Star* subjected her to an intolerably discriminatory workplace. We also note that on her final day of work, Coffey emailed Henry to "thank [her] sincerely" for "the privilege of working" for the *Star* and added that she "enjoyed and appreciate it more than I can say." This is not the statement of an employee who thinks her workplace is unbearable. The district court properly dismissed Coffey's religious-discrimination claim.

### 2.  Patterson's Religious-, Racial-, and Age-discrimination Claims

Patterson claims his dismissal from the *Star* was motivated by discrimination based on his religion, race, and age. Like Coffey, Patterson has established the first and third elements of his prima facie case. He is a member of three protected classes for purposes of these claims: He is African-American, he was 51-years old when fired, and he describes himself as a "traditional Christian" who is opposed to homosexual conduct as a matter of his

religious belief. And Patterson suffered an adverse employment action when the *Star* fired him.

The basic problem with all of Patterson's discrimination claims is that he cannot show he was meeting the *Star*'s legitimate performance expectations. The undisputed evidence establishes that Patterson had a long history of performance problems ranging from reporting errors to writing deficiencies. Patterson's poor performance continued after the *Star* placed him on a Performance Improvement Plan. We need not belabor this point; it goes without saying that factual accuracy, adequate reporting, and clean writing are legitimate performance expectations at a newspaper. Patterson claims that Swarens worked him harder than the other editorial writers and that other writers made more errors than he did, but there is no evidentiary support for these contentions.

Patterson's retaliation claim suffers from the same fundamental deficiency. Title VII prohibits employers from retaliating against employees for exercising their rights under the antidiscrimination statutes. *See* 42 U.S.C. § 2000e-3(a). As with his discrimination claims, Patterson proceeds on his retaliation claim under the indirect method of proof, which requires a showing that he (1) engaged in statutorily protected activity; (2) met the *Star*'s legitimate performance expectations; (3) suffered an adverse employment action; and (4) was treated less favorably than similarly situated employees. *Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 903 (7th Cir. 2005). Because the undisputed evidence establishes that Patterson was not meeting the *Star*'s legitimate performance ex-

pectations, he cannot establish a prima facie case of retaliation. Patterson's Title VII claims were properly dismissed.

### B. Negligent Infliction of Emotional Distress

Finally, the plaintiffs brought state-law claims for negligent infliction of emotional distress. Under Indiana law a party may pursue a claim for emotional distress under either the "modified impact" rule or the "bystander" rule. *See Atl. Coast Airlines v. Cook*, 857 N.E.2d 989, 998 (Ind. 2006). The plaintiffs do not come within Indiana's "bystander rule," which provides a cause of action for a person who witnesses the death or severe injury of a loved one. *See Groves v. Taylor*, 729 N.E.2d 569, 573 (Ind. 2000). As for the "modified impact" version of the tort, there is no evidence whatsoever to support such a claim.

Until 1991, Indiana courts permitted recovery for the negligent infliction of emotional distress only if the emotional injuries were accompanied and caused by some physical injury. *See, e.g.*, *Charlie Stuart Oldsmobile, Inc. v. Smith*, 357 N.E.2d 247, 253 (Ind. Ct. App. 1976). The Indiana Supreme Court has since modified this rule by permitting recovery for emotional distress even if the plaintiff did not suffer a physical injury. *See, e.g.*, *Shuamber v. Henderson*, 579 N.E.2d 452, 456 (Ind. 1991). But this theory still requires the plaintiff to prove he has suffered a "direct physical impact," although that physical impact need not have caused any physical injury. *Atl. Coast*

*Airlines*, 857 N.E.2d at 996; *see also Shuamber*, 579 N.E.2d at 456 (holding that "[w]hen . . . a plaintiff sustains a direct impact by the negligence of another and, by virtue of that direct involvement sustains an emotional trauma which is serious in nature and of a kind and extent normally expected to occur in a reasonable person, . . . such a plaintiff is entitled to maintain an action to recover for that emotional trauma without regard to whether the emotional trauma arises out of or accompanies any physical injury to the plaintiff"). Getting fired from a job does not qualify. *See Powdertech, Inc. v. Joganic*, 776 N.E.2d 1251, 1263 (Ind. Ct. App. 2002) (a plaintiff who is fired from a job does not sustain the necessary physical impact to establish a claim for negligent infliction of emotional distress). Accordingly, the district court properly dismissed the plaintiffs' claims for negligent infliction of emotional distress.

AFFIRMED.