In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-2201

VICTORIA SEREDNYJ,

*Plaintiff-Appellant*,

*v.*

BEVERLY HEALTHCARE, LLC,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 08-cv-00004—**Robert L. Miller, Jr.,** *Judge.*

ARGUED APRIL 5, 2011—DECIDED AUGUST 26, 2011

Before EASTERBROOK, *Chief Judge*, BAUER, *Circuit Judge*, and YOUNG, *District Judge*.[*]

YOUNG, *District Judge*. Beverly Healthcare, LLC ("Beverly"), employed Victoria Serednyj as an Activity Director in Beverly's Golden Living nursing home in Valparaiso, Indiana, from August 2006 to March 2007. In

[*] The Honorable Richard L. Young, Chief Judge of the United States District Court for the Southern District of Indiana, sitting by designation.

early January 2007, Serednyj learned she was pregnant, and, at the end of February 2007, she began to experience pregnancy-related complications. Her doctor placed her on bed rest for two weeks, and, at the end of this two-week period, her doctor placed her on light duty restrictions. Serednyj asked to be accommodated, and Beverly denied her request under its modified work policy. Because Serednyj also did not qualify for leave under the Family Medical Leave Act ("FMLA"), Beverly terminated her employment. Serednyj then filed suit against Beverly, alleging gender discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"), pregnancy discrimination under Title VII, as amended by the Pregnancy Discrimination Act ("PDA"), disability discrimination under the Americans with Disabilities Act ("ADA"), and retaliation. Beverly moved for summary judgment, which the district court granted. Serednyj now appeals. For the reasons set forth below, we affirm.

## I.  Background

### A.  The Activity Director Position

On August 11, 2006, Serednyj was hired as an Activity Director by Dawn Mount, the Executive Director of Beverly's Golden Living nursing home in Valparaiso, Indiana. Prior to that time, Serednyj worked at Beverly two distinct times as a certified nursing assistant ("CNA"), and both times, she voluntarily quit the position.

The duties of an Activity Director are to plan, implement, and participate in morning and/or afternoon activities

for the residents at the nursing home facility. During Serednyj's term as Activity Director, she attended morning meetings, conducted exercise classes, developed a monthly calendar, shopped for activities, set up and prepared for activities, assisted residents to and from activities, and planned activities, including bingo, arts and crafts, cooking, and excursions outside the facility. In addition, Serednyj supervised the Assistant Activity Director, who assisted Serednyj with all of her job functions, conducted evening activities, and worked on Serednyj's off days.

The execution of Serednyj's duties entailed some physically strenuous functions. These included: (1) transporting residents to activities in either wheelchairs or much heavier "geri chairs"; (2) rearranging dining room tables for specific activities, and later setting them back into place; (3) shopping for supplies for use in the activities, including bingo prizes, snacks, and drinks, which required her to lift and transport heavy shopping bags; and (4) setting up and maintaining the rather large monthly activity calendar, which required her to stand on a stool and staple the calendar to corkboard mounted on a wall. Other Beverly employees voluntarily assisted her with these functions, including Eric Christe, a physical therapy assistant, other members of the physical therapy department, and other CNAs.

The job description for the position of Activity Director includes an "Essential Functions" heading, a "Qualifications" heading, and an "Other Job Functions" heading. Underneath the "Other Job Functions" heading

is a section entitled "Physical and Sensory Requirements." These requirements include: "[w]alking, reaching, climbing, bending, lifting, grasping, fine hand coordination, pushing and pulling, ability to read and write, ability to communicate with residents and personnel, and ability to remain calm in emergency situations and when handling multiple tasks."

## B. Serednyj's Pregnancy Complications

On December 14, 2006, Serednyj learned she was pregnant, but she suffered a miscarriage days later. On January 7, 2007, she learned she was pregnant again.[1] Shortly after learning of the second pregnancy, she informed Mount, her supervisor, and others at Beverly that she was pregnant. Mount congratulated Serednyj, and Serednyj continued to perform all of her required duties and to work her regular schedule throughout January and February 2007.

At the end of February 2007, Serednyj began to have complications with her pregnancy, including spotting and cramping. She went to the hospital and was seen by Dr. Wallace Sherritt, who was covering for her regular physician, Dr. Kurt Wiese. After conducting several tests, Dr. Sherritt concluded that Serednyj's progesterone levels were low, that she had bleeding behind the placenta, and shearing of the uterus. He informed

---

[1] There is no explanation in the record below as to why the two pregnancies were so close in time.

her that if these complications were not addressed immediately, she would suffer another miscarriage. Dr. Sherritt prescribed progesterone suppositories twice a day and told Serednyj not to perform strenuous activities.

Serednyj explained her situation to Mount. A few days later, Mount asked for further explanation regarding what work duties she could and could not perform. Dr. Sherritt provided a doctor's note, dated February 27, 2007, which reads, in relevant part:

> I have seen this patient and have instructed her that she is to limit her activities to no heavy lifting or strenuous activities. She has explained her responsibilities that pertain to her work and she has been advised that she is not to participate in her usual work load. If she cannot perform duties that are of a limited nature then she needs to stay off of work until she can be re-evaluated by Dr. Wiese upon his return next week. Failure to do so could jeopardize her pregnancy.

These restrictions meant that Serednyj could not set up and move tables for activities in the nursing home, push patients in their wheelchairs to those activities, nor decorate and maintain the activity calendar. Serednyj requested to be excused from these activities.

Mount explained Beverly's modified work policy to Serednyj, and informed her that she could not return to work until Dr. Wiese released her back to full duty. The modified work policy, known as HR-305, states: "The Company only provides one type of restricted or limited duty to employees with non-work related injuries or

conditions," which is accommodated duty "as one form of reasonable accommodation under the Americans with Disabilities Act (ADA) or comparable state law, where medically necessary for qualified individuals with disabilities to perform essential functions." The policy states in bold, "No other restricted or limited duty is permitted for non-work related injuries or conditions." Mount also informed Serednyj that she had not been employed long enough to qualify for FMLA leave.

On March 1, 2007, Dr. Sherritt faxed another note to Mount, which stated: "After reviewing your form and considering this patient's situation I have decided that in her best interest I cannot give my permission for her to continue working in any capacity." Dr. Sherritt indicated that Serednyj's physician, Dr. Wiese, would return to work soon, and that he deferred to his judgment regarding her work restrictions.

Serednyj saw Dr. Wiese on March 6, 2007, and he signed a small form entitled "Disability Certificate." Dr. Wiese reported that Serednyj was totally incapacitated (on bed rest) from March 2, 2007, to March 14, 2007, and was still unable to return to work. Serednyj showed the form to Mount, and informed her she was to see Dr. Wiese again on March 13, 2007. Mount told her that if she could not return to work on March 14, 2007, without restrictions, she would have to "let her go."

On March 13, 2007, Serednyj saw Dr. Wiese, who wrote a note saying "light duty or unable to work until further notice." Serednyj gave the note to Mount, who again informed Serednyj that she did not fall within Beverly's

modified work policy because her injury was not "work related," and that she had not worked there long enough to qualify for FMLA leave. Mount terminated her employment.

Serednyj hired an attorney, who drafted a letter to Beverly, dated March 21, 2007, requesting an accommodation pursuant to the ADA and the PDA. Mount informed Serednyj she would look into it again, and contacted the Division Manager of Human Resources, Connie Rebey. After this discussion, Mount called Serednyj on March 26, 2007, to inform her a second time that she was not eligible for light duty work under Beverly's modified work policy.

On April 10, 2007, Beverly filled out an Earning Information Request form for Serednyj for Indiana state welfare. Beverly indicated on the form that Serednyj was "fired" from her job.

In June 2007, Serednyj's physician lifted her restrictions and informed her that she could begin exercising again. Serednyj had a healthy baby boy on September 24, 2007, and began working part-time at Wal-Mart on December 5, 2007, without any restrictions. Serednyj became pregnant again with her second child in January or February 2009, and suffered no complications throughout that pregnancy.

## II.  Analysis

Summary judgment is appropriate if the record "shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The Court reviews *de novo* a district court's grant of summary judgment, viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Hall v. Nalco Co.*, 534 F.3d 644, 646 (7th Cir. 2008). When a summary judgment motion is submitted and supported by evidence as provided in Rule 56(c), the nonmoving party may not rest on mere allegations or denials in its pleadings, but "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

## A.  Title VII and the PDA

Title VII prohibits employment discrimination on the basis of sex. 42 U.S.C. § 2000e-2(a). In 1978, Congress amended Title VII by enacting the PDA to explicitly extend protection to pregnant women:

> The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work . . . ."

42 U.S.C. § 2000e(k). "The PDA created no new rights or remedies, but clarified the scope of Title VII by recognizing certain inherently gender-specific characteristics that may not form the basis for disparate treatment of employees." *Hall*, 534 F.3d at 647 (citing *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 678-79 (1983)). "The PDA 'made clear that, for all Title VII purposes, discrimination based on a woman's pregnancy is, on its face, discrimination because of her sex.'" *Id*. (quoting *Newport News*, 462 U.S. at 684); *see also Griffin v. Sisters of Saint Francis, Inc.*, 489 F.3d 838, 843 (7th Cir. 2007) (stating that "pregnancy is a proxy for gender, and, therefore, discrimination against pregnancy is discrimination against women"). Thus, Serednyj's claim for pregnancy discrimination is a claim for gender discrimination, and the legal analysis for both claims is the same. *Griffin*, 489 F.3d at 842-43. Accordingly, we analyze these claims together.

### 1. Direct Method

A plaintiff can show that she was a victim of intentional discrimination either by proceeding under the direct method or the indirect, burden-shifting method. *Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004) (citing *Cianci v. Pettibone Corp.*, 152 F.3d 723, 727-28 (7th Cir. 1998)). Serednyj proceeds under both methods of proof.

Under the direct method, the plaintiff may show, either through direct or circumstantial evidence, that the em-

ployer's decision to take the adverse job action against her was motivated by an impermissible purpose, such as sex. *Id.* (citing *Cianci*, 152 F.3d at 727). "Direct evidence is evidence that, if believed by the trier of fact, would prove discriminatory conduct on the part of the employer without reliance on inference or presumption." *Id.* (citing *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003)). This type of evidence "requires an admission by the decision-maker that [her] actions were based upon the prohibited animus." *Id.* (quoting *Rogers*, 320 F.3d at 753) (internal quotations omitted). A plaintiff may also establish her direct case by presenting a convincing mosaic of circumstantial evidence from which a reasonable juror could infer intentional discrimination by the decisionmaker. *Id.* (quoting *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994)). Serednyj's circumstantial evidence "'must point directly to a discriminatory reason for the employer's action.'" *Id.* (quoting *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003)).

### a. Direct Evidence

Beverly's modified work policy provides accommodations to qualified individuals with a disability under the ADA or to those employees who sustain work-related injuries. Serednyj argues that the policy's terms violate the PDA's provision that pregnant employees "shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work . . . ." 42 U.S.C.

§ 2000e(k). According to Serednyj, an employee who is disabled or suffers a work-related injury and receives an accommodation of light duty work receives better treatment than a pregnant employee, like Serednyj, who needs the same accommodation to maintain her employment.

The PDA requires that an employer ignore a female employee's pregnancy and treat that employee the same as it would have if she were not pregnant. *Piraino v. Int'l Orientation Resources, Inc.*, 84 F.3d 270, 274 (7th Cir. 1996); *Troupe*, 20 F.3d at 738. In the context of this case, this means that an employer is not required to provide an accommodation to a pregnant employee unless it provides the same accommodation to its similarly situated nonpregnant employees. *See Dormeyer v. Comerica Bank-Illinois*, 223 F.3d 579, 583 (7th Cir. 2000) ("[T]he Pregnancy Discrimination Act does not protect a pregnant employee from being discharged after her absence from work even if her absence is due to pregnancy or to complications of pregnancy, unless the absences of nonpregnant employees are overlooked."); *Troupe*, 20 F.3d at 738 ("The Pregnancy Discrimination Act requires the employer to ignore an employee's pregnancy, but . . . not her absence from work, unless the employer overlooks the comparable absences of nonpregnant employees.").

Contrary to Serednyj's assertion, Beverly's modified work policy is not direct evidence of discrimination. The policy complies with the PDA because it does, in fact, treat nonpregnant employees the same as pregnant

employees—both are denied an accommodation of light duty work for non-work-related injuries. This is all the PDA requires. We, therefore, agree with the district court and find that Beverly's modified work policy is "pregnancy-blind," and therefore valid. *See Spivey v. Beverly Healthcare Enterprises, Inc.*, 196 F.3d 1309, 1312-13 (11th Cir. 1999) (holding that the same policy against the same defendant is valid under the PDA and citing *Troupe* and *Piraino*); *see also Reeves v. Swift Transp. Co.*, 446 F.3d 637, 641 (6th Cir. 2006) (holding a similar policy valid because the policy "does not grant or deny light work on the basis of pregnancy, childbirth, or related medical condition" and citing *Troupe*); *Urbano v. Cont'l Airlines, Inc.*, 138 F.3d 204, 206 (5th Cir. 1998) (holding a similar policy valid because the light-duty policy treated pregnant employees the same as nonpregnant employees and citing *Troupe* and *Piraino*).

### b.  Indirect Evidence

Serednyj does not have direct evidence that Beverly discriminated against her due to her pregnancy. Thus, to survive summary judgment under the direct method, Serednyj must present a convincing mosaic of circumstantial evidence from which a reasonable juror could infer intentional discrimination by Beverly. Serednyj's mosaic may be comprised of three categories of circumstantial evidence, each of which is sufficient by itself to support a judgment for the plaintiff. *Troupe*, 20 F.3d at 736. The first category "consists of suspicious timing, ambiguous statements oral or written, behavior toward

or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent may be drawn." *Id*. The second category consists of evidence that similarly situated employees outside of the protected group (pregnancy, sex, race, etc.) received systematically better treatment. *Id*. The third category consists of "evidence that the plaintiff was qualified for the job in question but passed over in favor of (or replaced by) a person not having the forbidden characteristic and that the employer's stated reason for the difference in treatment is unworthy of belief, a mere pretext for discrimination." *Id*.

As her first piece of circumstantial evidence, Serednyj contends that before she became pregnant, she received assistance from other Beverly employees, including Christe and other CNAs, in performing such job duties as moving dining room tables and transporting residents by wheelchair or geri chair to and from planned activities. But after she became pregnant and asked for the same assistance in the form of an accommodation, Beverly denied her request and terminated her employment.

For purposes of the PDA and Title VII, a request for an accommodation is materially different than a request for assistance. The assistance Serednyj received from her co-workers before she became pregnant was completely voluntary and given in a spirit of teamwork. If a co-worker could not or would not assist her in her job duties, that co-worker was free to decline her request, and was otherwise under no obligation to provide assis-

tance. If Beverly were to grant Serednyj's request for an accommodation, however, Serednyj's job duties would be formally modified to light duty work, and the assistance given by her co-workers would be obligatory. Beverly's decision to deny Serednyj's request for an accommodation is not circumstantial evidence of intentional discrimination. Instead, as the district court observed, it is direct evidence that Beverly applied its modified work policy to her.

Serednyj also contends that Beverly discriminated against her by not providing her an accommodation with respect to certain job duties that were not listed as "Essential Functions" in her written job description. Serednyj argues, "[n]owhere in the internet job posting, or the job description given to [Serednyj] that contained the essential functions of her job, stated anything about lifting, transporting patients, doing the activity board, or lifting shopping bags, the very accommodations which [Serednyj] requested."

In determining the essential functions of a position, a court may consider, but is not limited to, evidence of the employer's judgment as to which functions are essential, and the written job description in effect before the employee interviewed for the position. *Basith v. Cook County*, 241 F.3d 919, 927 (7th Cir. 2001) (citing 29 C.F.R. § 1630.2(n)(3)).

According to Beverly, an Activity Director must be able to perform certain physically strenuous activities in order to carry out the duties of the position, such as transporting patients by wheelchair. Moreover, the job

description for the Activity Director position contains a physical and sensory requirement which expressly provides that an Activity Director must be able to, among other things, reach, climb, lift, push, and pull. The fact that this requirement was listed under the "Other Functions" heading rather than the "Essential Functions" or "Qualifications" headings of the job description is not evidence that the physical requirements of her job—i.e., pushing wheelchairs, lifting shopping bags, hanging the monthly calendar, and moving tables—were not essential to the overall fulfillment of the Activity Director position. Indeed, Serednyj expressly admitted in her deposition that these physical demands were in fact duties of her job. We, therefore, conclude that Beverly's understanding of the essential functions of the Activity Director position was correct, and is not circumstantial evidence of intentional discrimination.

Serednyj next argues that after she provided the March 21, 2007, letter to Beverly requesting an accommodation pursuant to the PDA and the ADA, Beverly began to think of ways to fire her. In support of this argument, Serednyj cites to the notes that Mount made of her conversation with her, which include the words "office mess," "attendance," and "overall organization." Serednyj's argument contradicts the record facts, including her own testimony, that her employment had already terminated on March 13, 2007, following a meeting with Mount. Thus, there is no supporting evidence that Beverly began to "think" of reasons to terminate her employment after March 21, 2007, as she was no longer an employee of Beverly.

Finally, Serednyj attempts to show pregnancy discrimination by summarily stating, without any record citation, that Beverly terminated her while she had paid leave remaining. This argument is not supported by the record evidence, which reflects that Beverly did pay Serednyj all of her unused sick and vacation leave pursuant to its policies.

These four pieces of evidence, taken together, fail to create a convincing mosaic of circumstantial evidence from which a jury could infer intentional discrimination on the part of Beverly. We now turn to Serednyj's indirect case.

### 2. Indirect Case

As noted above, a plaintiff may also use the indirect, burden-shifting approach to frame her case. The indirect method requires a plaintiff to first establish a prima facie case of discrimination. For purposes of Serednyj's pregnancy discrimination claim, Serednyj must show that: (1) she was pregnant and her employer knew she was pregnant; (2) she was performing her job duties satisfactorily; (3) she was terminated; and (4) similarly situated, nonpregnant employees were treated more favorably. *Griffin*, 489 F.3d at 844 (citing *Clay v. Holy Cross Hosp.,* 253 F.3d 1000, 1005 (7th Cir. 2001)). Once a plaintiff sets forth a prima facie case of discrimination, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for terminating her. *Id*. If such a reason is advanced, the plaintiff can survive summary judgment only by showing that the

defendant's reason was a pretext for intentional discrimination. *Id*.

The first, second, and third elements of Serednyj's prima facie case are not in dispute. Serednyj is a member of a protected class, was performing her job satisfactorily, and was subject to an adverse employment action. With respect to the fourth element of her prima facie case, Serednyj claims that similarly situated, nonpregnant employees were treated more favorably than she, and that disabled or pregnant employees were also treated more favorably than she.

Employees are similarly situated if they are "directly comparable to her in all material respects." *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002). "This normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000). The similarly situated inquiry is "a flexible one that considers 'all relevant factors, the number of which depends on the context of the case.'" *Humphries v. CBOS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007) (quoting *Radue,* 219 F.3d at 617). A plaintiff need not show complete identity with a proposed comparator, but she must show "'substantial similarity.'" *Id*. (quoting *Radue*, 219 F.3d at 618).

Serednyj's would-be comparators include a woman named "Bonnie," Susan Eckman, Carol Williams, Pam

Seibert, and Gina Sizemore. With respect to "Bonnie," Christe testified that "Bonnie" is a CNA "in her late fifties" who received assistance transporting and transferring patients. Christe did not know Bonnie's last name, and does not know if she has a medical restriction. Mount testified that since November 2004, the only individual employed by Beverly with the first name of "Bonnie" was Bonnie Curtis, a CNA, who in fact never requested nor received any accommodation from Beverly.

Susan Eckman was employed by Beverly as a CNA and LPN between September 2006 and March 2007. According to Serednyj, Eckman had breast augmentation surgery during this time period, and was provided light duty work. Serednyj testified that she had no personal knowledge of this, but was told this information from her friend and co-worker, Gina Sizemore. Moreover, Mount testified that Eckman never sought nor received an accommodation for a breast augmentation.

Carol Williams was employed by Beverly who, according to Serednyj, worked as a CNA and suffered from and was being treated for an L3, L4 disc degeneration in her back. Serednyj claims that Williams' disc problem was not work-related; however, Beverly allowed her to work with significant lifting, bending, and twisting restrictions. Mount testified that Williams was an LPN, and suffered two non-work-related injuries during her employment. As a result of her non-work-related injuries, Williams was not eligible for light duty under Beverly's modified work policy, but took two leaves

of absence instead. Williams also sustained two work-related injuries in 2006 and 2007. The record does not indicate whether Williams asked for and received an accommodation for her work-related injuries, but if she had, it would have been pursuant to Beverly's modified work policy.

Pam Seibert was a speech therapist who worked at Beverly's Golden Living facility with Serednyj. Although Seibert and Serednyj worked at the same facility, Seibert was an employee of Aegis Therapies, a separate company with separate employment policies. Because Seibert had a long-term medical condition, Aegis allowed her to use a rolling walker to move about the workplace and allowed her to take breaks at her desk. Serednyj alleges that Seibert was terminated within thirty days of requesting the accommodation. To the extent that Serednyj's claim is true, Seibert is not similarly situated to Serednyj because Seibert was not an employee of Mount, and was not subject to Beverly's modified work policy.

Gina Sizemore worked as a CNA at the Golden Living facility, and was pregnant at approximately the same time as Serednyj. Serednyj testified that she and Sizemore were friends, and that Sizemore told her that she (Sizemore) had to go on FMLA due to restrictions from her pregnancy. Sizemore tried to return to work following the expiration of her FMLA leave, but was terminated by Mount because her doctor would not remove her restrictions. Sizemore does not help Serednyj's case for two significant reasons. First,

Serednyj's evidence is based on inadmissible hearsay. And second, Sizemore is actually an example of Beverly applying its modified work policy uniformly.

Serednyj has not come forward with a similarly situated, nonpregnant Beverly employee who was treated more favorably than she. Serednyj's evidence in this regard lacks reliability, and in certain circumstances, is belied by the record. Having failed to set forth a prima facie case, we need not reach the issue of pretext, and the inquiry ends. *See Cowan v. Glenbrook Sec. Servs., Inc.*, 123 F.3d 438, 445 (7th Cir. 1997) ("We need not reach the issue of pretext, as plaintiff has failed to state a prima facie case of discriminatory discharge under *McDonnell Douglas*."). Accordingly, the district court correctly granted Beverly's motion for summary judgment on Serednyj's gender and pregnancy discrimination claims.

**B. ADA**

Title I of the ADA[2] prohibits employers from discriminating "against a qualified individual with a disability

---

[2] Significant changes to the ADA went into effect on January 1, 2009, after the events in this case occurred. *See* ADA Amendments Act of 2008, Pub.L. No. 110-325, 122 Stat. 3553 (2008). Because Congress did not express an intent that the changes take effect retroactively, we are bound by the law in place prior to the amendments. *Fredricksen v. United Parcel Serv. Co.*, 581 F.3d 516, 521 n. 1 (7th Cir. 2009).

because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Title I also provides that an employer discriminates against a qualified individual with a disability by "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A). Serednyj claims that Beverly should have granted her request for an accommodation under its modified work policy, and that Beverly's failure to grant her request constitutes both a failure to accommodate and disability discrimination, in violation of Title I of the ADA. Accordingly, we will begin our discussion with the threshold issue of whether Serednyj's pregnancy-related complications rendered her "disabled" within the meaning of the ADA. This is an issue of first impression in the federal circuit courts of appeal.

The term "disability" is defined under the ADA to mean, with respect to an individual: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). Serednyj proceeds under all three definitions.

### 1. Section 12102(2)(A)

### a. Physical or Mental Impairment

The Equal Employment Opportunity Commission ("EEOC") regulations define "physical or mental impairment" as "any physiological disorder or condition" that affects one or more body systems, including the reproductive system. 29 C.F.R. § 1630.2(h)(1). The EEOC's Interpretive Guidance specifically excludes pregnancy as a physical impairment. 29 C.F.R. Pt. 1630, App. § 1630.2(h) ("conditions, such as pregnancy, that are not the result of a physiological disorder are also not impairments"). Courts that consider these regulations consistently find that pregnancy, absent unusual circumstances, is not a physical impairment. *See Gudenkauf v. Stauffer Comm., Inc.*, 922 F. Supp. 465, 473 (D. Kan. 1996) ("Pregnancy is a physiological condition, but it is not a disorder. Being the natural consequence of a properly functioning reproductive system, pregnancy cannot be called an impairment."); *see also Gabriel v. City of Chicago*, 9 F. Supp. 2d 974, 980 (N.D. Ill. 1998) (overruling its prior decision in *Chapsky v. Baxter V. Mueller Div.*, 1995 WL 103299 (N.D. Ill. March 9, 1995), that pregnancy is a disability per se); *Darian v. Univ. of Massachusetts Boston*, 980 F. Supp. 77, 85 (D. Mass. 1997) (holding that although "pregnancy per se is not covered by the ADA, the Act does not necessarily exclude all pregnancy-related conditions and complications"); *Villarreal v. J.E. Merit Constructors, Inc.*, 895 F. Supp. 149, 152 (S.D. Tex. 1995) (holding that absent unusual circumstances, pregnancy is not a physical impairment under the ADA).

Defining what constitutes an "unusual circumstance" arising out of a pregnancy has been the subject of many district court decisions. The most persuasive decisions draw a distinction between a normal, uncomplicated pregnancy, and an abnormal one—i.e., one with a complication or condition arising out of, but distinguishable from, the pregnancy. *See Gabriel*, 9 F. Supp. 2d at 981; *Darian*, 980 F. Supp. at 87; *Hernandez v. City of Hartford*, 959 F. Supp. 125, 130 (D. Conn. 1997); *Cerrato v. Durham*, 941 F. Supp. 388, 392 (S.D.N.Y. 1996). In this regard, the analysis in *Hernandez* is worth a brief discussion.

In *Hernandez*, the district court held that pregnancy-related complications may constitute physical impairments if they are the product of a physiological disorder. 959 F. Supp. at 130. The district court defined "physiologic" as "characteristic of or conforming to the normal functioning or state of the body or a tissue or organ," and concluded that "a physiological disorder is an abnormal functioning of the body or a tissue or organ." *Id.* (quoting DORLAND'S MEDICAL DICTIONARY (27th ed. 1988)). Citing the American Medical Association's Council on Scientific Affairs, the district court gave examples of pregnancy-related conditions that "'may be disabling for further work.'" *Id.* (quoting *Cerrato*, 941 F. Supp. at 393). Among those complications were the "'premature rupture of membranes, vaginal bleeding . . . risk of premature [birth] . . . and a number of others.'" *Id.* (quoting *Cerrato*, 941 F. Supp. at 393). Applying these definitions to the plaintiff's case, the district court concluded that the plaintiff's premature labor that was controlled only through

medication "was not a function of a normal pregnancy. It was a physiological disorder." *Id*.

Serednyj's pregnancy-related complications included, *inter alia*, spotting, cramping, and an increased risk of miscarriage. In addressing these medical issues, her doctor prescribed progesterone suppositories and bed rest for two weeks. We find this evidence may support the inference that these complications were not the result of a normal pregnancy, and were, in fact, physio-logical disorders of the reproductive system. *See Spees v. James Marine, Inc.*, 617 F.3d 380, 397 (6th Cir. 2010) ("There thus appears to be a general consensus that an increased risk of having a miscarriage at a minimum constitutes an impairment falling outside the range of a normal pregnancy."). However, even if the evidence supported that inference, we find, for the reasons set forth below, that her physical impairment did not sub-stantially limit a major life activity.

### b. Substantially Limits a Major Life Activity

To meet the definition of disability, Serednyj must also show that her physical impairment substantially limits a major life activity. Serednyj claims that her physical impairment substantially limited her major life activities of reproduction and lifting.

The term "substantially limited" refers to the inability to perform a major life activity as compared to the average person in the general population, or a significant restriction "as to the condition, manner, or duration" under

which an individual can perform a particular activity. 29 C.F.R. § 1630.2(j). In determining whether a disability "substantially limits" a person from performing a major life activity, courts consider "'the nature and severity of the impairment; the duration or expected duration of the impairment; and the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.'" *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 937 (7th Cir. 2007) (quoting 29 C.F.R. § 1630.2(j)(2)(i)-(iii)). Thus, courts generally find that short-term, temporary restrictions, with little or no long-term impact, are not substantially limiting and do not render a person disabled for purposes of the ADA. *See* 29 C.F.R. Pt. 1630, App. § 1630.2(j) ("[T]emporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities. Such impairments may include, but are not limited to, broken limbs, sprained joints, concussions, appendicitis, and influenza."); *Waggoner v. Olin Corp.*, 169 F.3d 481, 484 (7th Cir. 1999) ("Disability does not include temporary medical conditions."); *Hamm v. Runyon*, 51 F.3d 721, 725 (7th Cir. 1995) ("Under the ADA, '[i]ntermittent, episodic impairments are not disabilities.'" (quoting *Vande Zande v. State of Wis. Dep't of Admin.*, 44 F.3d 538, 544 (7th Cir. 1995))).

Pregnancy is, by its very nature, of limited duration, and any complications which arise from a pregnancy generally dissipate once a woman gives birth. Accordingly, an ADA plaintiff asserting a substantial limitation of a major life activity arising from a pregnancy-related physiological disorder faces a tough hurdle. A case

from the Southern District of New York, *LaCoparra v. Pergament Home Ctrs., Inc.*, is illustrative of this point. 982 F. Supp. 213 (S.D.N.Y. 1997), *overruled on other grounds by Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 724 (2d Cir. 2001). In that case, the plaintiff suffered from a history of infertility, a prior miscarriage, and spotting and cramping during her pregnancy, and was granted leave from her employer in April 1994. *Id.* at 217, 228. The district court granted defendant's motion for summary judgment on plaintiff's ADA claim because there was no evidence that her conditions "were chronic or resulted in long-term or permanent impact." *Id.* at 228. The district court reasoned that the spotting occurred only in the first trimester; she was on bed rest for a short period of time; her activities were limited only during her pregnancy; and she was physically able to return to work by January 1995. *Id.*

District court decisions from this circuit also guide our analysis. For example, in *Payne v. State Student Assistance Comm.*, the plaintiff suffered from pregnancy-induced hypertension. 2009 WL 1468610, at *3 (S.D. Ind. May 22, 2009). The district court held that her condition did not substantially limit her in the major life activity of reproduction, reasoning that her condition was temporary, lasting only as long as the pregnancy, and she introduced no evidence to show that she suffered any long-term limitations as a result. *Id.* at *8. *See also Muska v. AT&T Corp.*, 1998 WL 544407, at *9 (N.D. Ill. Aug. 25, 1998) (holding that plaintiff's pregnancy-induced complication of fetal distress did not substantially limit her in the major life activity of reproduc-

tion, because the plaintiff's impairment lasted only two months, and there was no evidence that her impairment jeopardized her ability to carry a fetus to term in the future). *But see Gabriel*, 9 F. Supp. 2d at 983 (finding an issue of fact as to whether plaintiff was substantially limited in the major life activity of standing, where her swollen feet, back pain, and stomach pain resulted in her being unable to stand for long periods of time throughout her pregnancy, she delivered two months prematurely, and her condition persisted even after she gave birth); *Hernandez*, 959 F. Supp. at 131 (finding an issue of fact as to whether plaintiff was substantially limited in the major life activity of working, where her doctor noted the severity of her condition of premature labor and asked that she be allowed to work from home, her condition lasted throughout her pregnancy and was controlled only through the use of medication, and she was unable to perform the essential functions of her job due to the negative impact that work-related stress had on her condition).

Serednyj's pregnancy-related complications did not last throughout her pregnancy or extend beyond the time she gave birth. Complications arising from her pregnancy began at the end of February 2007, when her doctor ordered her to refrain from heavy lifting or strenuous activities. By her own admission, her doctor removed all of her restrictions by June 2007, approximately four months after her complications arose, and several months before she gave birth. Although she was on bed rest, this treatment lasted only from March 2, 2007, through March 14, 2007, and she was physically able to

return to work in December 2007, approximately three months after giving birth. In addition, there is no evidence in the record reflecting that her ability to reproduce in the future and carry a fetus to term was impacted by her pregnancy-induced complications. In fact, Serednyj's subsequent pregnancy presented no pregnancy-related complications.

Moreover, the record indicates that her lifting restriction was of limited duration, and not an abnormal condition of her pregnancy. Indeed, the inability to do heavy lifting is not a substantial limitation as compared to the average person. *Zahurance v. Valley Packaging Indus., Inc.*, 397 Fed. Appx. 246, 248 (7th Cir. 2010) (holding that a 20-pound lifting restriction does not substantially limit ability to lift); *Mays v. Principi*, 301 F.3d 866, 869 (7th Cir. 2002) (expressing doubt whether 10-pound lifting restriction substantially limits ability to lift); *Ray v. Glidden Co.*, 85 F.3d 227, 229 (5th Cir. 1996) (per curiam) (holding that the inability to perform "heavy lifting" does not substantially limit ability to lift). Contrary to her position, the fact that her lifting restriction disqualified her from her position at Beverly is not evidence of a substantial limitation. *Mack v. Great Dane Trailers*, 308 F.3d 776, 781 (7th Cir. 2002) ("An inability to lift heavy objects may disqualify a person from particular jobs but does not necessarily interfere with the central functions of daily life.").

On this record, we find that Serednyj's pregnancy-related complications did not substantially limit her in the major life activities of reproduction or lifting. Her

pregnancy-related impairments were of limited dura-
tion, and there is no evidence that she has suffered any
long-term limitations as a result. Because Serednyj fails
to establish that she suffered from a disability, her
ADA claim under Section 12102(2)(A) fails as a matter
of law.

### 2.   Section 12102(2)(B): Record of Disability

To succeed under her "record of disability" claim,
Serednyj must again show that she had a "physical im-
pairment that substantially limits one or more major
life activities." 29 C.F.R. § 1630.2(k). As demonstrated
above, Serednyj does not have evidence to that effect,
and thus, her ADA claim under Section 12102(B) also
fails as a matter of law.

### 3.   Section 12102(2)(C): Regarded as Having an Im-
pairment

To fall within the statutory definition of a "regarded
as" claim, a plaintiff must show that: (1) the employer
mistakenly believes the employee has an impairment
that substantially limits a major life activity, or (2) the
employer mistakenly believes the employee's actual, but
nonlimiting, impairment substantially limits a major life
activity. *Nese v. Julian Nordic Const. Co.*, 405 F.3d 638, 641
(7th Cir. 2005) (citing *Amadio v. Ford Motor Co.*, 238 F.3d
919, 925 (7th Cir. 2001)). "In other words, the employer
'must believe either that one has a substantially limiting
impairment that one does not have or that one has a

substantially limiting impairment when, in fact, the impairment is not so limiting.'" *Id.* (quoting *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999)). The purpose of the "regarded as" prong is to prohibit employers from making ill-informed decisions based on myth or stereotype. *Moore v. J.B. Hunt Transport, Inc.*, 221 F.3d 944, 954 (7th Cir. 2000).

Serednyj argues that Beverly regarded her as disabled because it knew that she suffered a prior miscarriage, that she was having pregnancy-related complications, and that her doctor had placed her on lifting restrictions. There is no evidence in the record that Beverly misperceived the nature of her condition, or denied her request for light duty work based on a stereotype of pregnant women suffering from complications. If anything, the record shows that Beverly did not grant her request for light duty work under its modified work policy because it truly believed that she was not disabled under the ADA; otherwise, it would have granted her an accommodation rather than deny her request outright. We therefore find that the district court correctly granted summary judgment on Serednyj's ADA claims.

## C. Retaliation

A Title VII plaintiff may prove her retaliation claim under the direct and indirect methods of proof. *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 662 (7th Cir. 2006). The direct method requires her to show that: (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) there is a causal connection

between the protected activity and the adverse action. *Id*. at 663. The indirect method requires her to show that: (1) she engaged in statutorily protected activity; (2) she was performing her job to her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Id*. Once a prima facie case is set forth, the burden-shifting pretext analysis takes place. *Id*. Serednyj proceeds under both methods of proof.

Serednyj claims that after she submitted her March 21, 2007, letter formally requesting an accommodation pursuant to the PDA and ADA, Beverly began searching for reasons to fire her. Specifically, Serednyj cites to Mount's note that states, "office mess, attendance, overall organization," and has the dates "3/23/2007" and "3/26/2007" written on it.

For this claim to survive under either the direct or indirect method of proof, Serednyj must bring forth evidence from which a reasonable jury could conclude that she suffered an adverse employment action. Serednyj admits that at the time she submitted her March 21, 2007, letter requesting an accommodation, she was no longer an employee of Beverly. We can think of no reason why Beverly would look for reasons to fire her when she was no longer an employee of the company. If anything, the evidence reflects that Mount considered her request, contacted the Division Manager of Human Resources, Connie Rebey, to discuss the request, and called Serednyj back to inform her, once again, that she was not

eligible for light duty work under the modified work policy. This is not evidence of retaliation.

Serednyj also claims that Beverly fired her even though she had paid leave remaining. As noted previously, the record reflects that Beverly paid all of Serednyj's sick and vacation leave pursuant to its policies. Serednyj does not explain how paying the leave owed to a terminated employee is a retaliatory, materially adverse action taken against a former employee.

Lastly, Serednyj claims that Beverly indicated on her state welfare form that she was "fired." According to Serednyj, this is retaliatory because: (1) Beverly had previously taken the position that she "quit," and (2) a finding that she was "fired" could have jeopardized her receipt of benefits. Serednyj has consistently taken the position in this litigation that she was fired. As the district court recognized, Beverly reported what Serednyj contends is true. Further, Serednyj received state welfare benefits; thus, her contention that Beverly "could have" jeopardized her benefits is mere conjecture. Accordingly, the district court's grant of summary judgment on Serednyj's retaliation claim is affirmed.

### III.  Conclusion

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment against Serednyj.