In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-2553

VICTORIA HARPER,

*Plaintiff-Appellant*,

*v.*

FULTON COUNTY, ILLINOIS ,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 10-CV-01423 — **Michael M. Mihm**, *Judge.*

ARGUED FEBRUARY 20, 2014 — DECIDED APRIL 8, 2014

Before EASTERBROOK, MANION, and SYKES, *Circuit Judges.*

MANION, *Circuit Judge.* After the Fulton County Board voted not to raise the salary of the County Treasurer, Victoria Harper, she filed a § 1983 action against the County for sex discrimination. The County moved for summary judgment. After considering Harper's sex discrimination claim under both the direct and indirect methods, the district court concluded that the claim failed as a matter of law, and granted the

County's motion for summary judgment. Harper appeals. We affirm.

## I. Facts

Victoria Harper has served as County Treasurer for Fulton County, Illinois, since 1994. The County Treasurer is elected and serves a four-year term. *See* Ill. Const. art. VII, § 4(c); 55 ILCS 5/3-10001. After her election in 1994, Harper was re-elected in 1998, 2002, 2006, and 2010. Pursuant to the Illinois Counties Code, the Fulton County Board—a body composed of twenty-one members—is empowered to set the salaries for the County Treasurer, the County Clerk, and other elected officials. *See* 55 ILCS 5/4-6001. The Board's Finance Committee is composed of five members of the Board and focuses on the County's budget, expenditures, and general financial situation. The Finance Committee makes an initial recommendation to the Board regarding the salaries of the County Treasurer and County Clerk. From 1983–2002, the County Treasurer and County Clerk were paid the same salary. In the early 2000s, Ronald Rumler, the County Clerk, announced his decision to retire. The County Board voted to increase Rumler's salary in order to allow him to receive greater retirement benefits. Thus, from 2003–2006, the County Clerk's salary exceeded the County Treasurer's salary. After Rumler's retirement, the new County Clerk, James Nelson, and the County Treasurer were paid the same salary from 2007–2010.

In the years leading up to 2010, however, disputes arose between Harper and the members of the Finance Committee and the Board. These disputes seem to have prompted the Finance Committee to recommend against increasing the

County Treasurer's salary for her term in office commencing in December 2010.[1] At that time, the members of the Finance Committee were Bob Bucher, Steve Conklin, Mat Fletcher, Ed Huggins, and Rob Malott. At its May 11, 2010, meeting, the Board adopted this recommendation by a vote of 10–8. At the same meeting, the Board voted (16–2) to give the County Clerk annual pay raises for the term commencing in December 2010. As a result, Harper's salary remained $58,300 from 2010–2013, while Nelson's salary started at $64,300 and rose to $71,300 for the same period.

Harper believed that the decision to deny her pay raises while awarding pay raises to Nelson was the result of sex discrimination on the part of a critical mass of the male members of the Board. She responded by filing a § 1983 action against the County for sex discrimination in compensation in violation of the Fourteenth Amendment's Equal Protection Clause.[2] The County moved for summary judgment. The County identified a number of justifications for denying Harper pay raises, most of them centered around her work performance. The district court granted summary judgment in favor of the County. Harper appeals.

---

[1] Because the position of County Treasurer is an elected one, there could be no guarantee that Harper would succeed in her 2010 bid for re-election. However, the County concedes that the Board fully expected Harper to be re-elected in 2010.

[2] Her lawsuit included other causes of action that are not at issue in this appeal.

## II. Discussion

On appeal, Harper contends that the district court erred in concluding that her sex discrimination claim failed as a matter of law. We review the decision to grant a summary judgment motion *de novo* and construe the evidence in the light most favorable to Harper, the nonmoving party. *See* Fed. R. Civ. P. 56(a); *Serednyj v. Beverly Healthcare, LLC*, 656 F.3d 540, 547 (7th Cir. 2011). We must determine whether the evidence, so construed, establishes genuine disputes of material fact with respect to Harper's sex discrimination claim. *Id.* And because Harper contends that she can establish sex discrimination under both the direct and indirect methods, we consider both methods in turn.

### A. Direct Method

"Under the 'direct method,' the plaintiff may avoid summary judgment by presenting sufficient evidence, either direct or circumstantial, that the employer's discriminatory animus motivated an adverse employment action." *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012). "Direct evidence is evidence that would prove discriminatory intent without reliance on inference or presumption." *Makowski v. SmithAmundsen LLC*, 662 F.3d 818, 824 (7th Cir. 2011). Such evidence essentially "'requires an admission by the deci-sion-maker that [the decision-maker's] actions were based upon the prohibited animus.'" *Serednyj*, 656 F.3d at 548 (quoting *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004)). Should the plaintiff lack direct evidence, she may also point to circumstantial evidence that allows a jury to infer

intentional discrimination by the decision-maker. *Makowski*, 662 F.3d at 824.

Harper points to the testimony of two other County employees in an attempt to establish her sex discrimination claim under the direct method. First, Sandra Monari, a Board member from 1998–2010 and the Chairman from 2000–2004, testified by declaration (made under penalty of perjury pursuant to 28 U.S.C. § 1746) that, in 2004, Ed Ketchum, a male Board member, dispensed with the traditional approach to electing the Chairman and secured the position for himself through a floor nomination at a special meeting during "extremely severe weather conditions."[3] Monari also testified that at some point during Ketchum's chairmanship, he "and other male members" of the Board insisted that Teresa Abudusky, a female Board member, resign because her long work commute (about one hour and forty-five minutes) caused her to miss committee and Board meetings. Monari testified that Doug Manock, a male Board member, was not asked to resign even though he also had a long commute (about one hour and fifteen minutes) that caused him to be repeatedly absent from meetings. In addition, Monari testified that, during her twelve years as a Board member, she "observed the attitude and actions of the male board members" and concluded that "a sufficient number of the male members of the Board who had influence with the remaining male members of the Board were biased against women." Specifically, Monari

---

[3] *See Owens v. Hinsley*, 635 F.3d 950, 955 (7th Cir. 2011) ("[A] declaration under § 1746 is equivalent to an affidavit for purposes of summary judgment.").

stated that, based on her observations of the conduct of Ketchum, George Hall, Doug Manock, Steve Conklin, and Terry Piff in relation to the incidents wherein Monari lost the chairmanship and Abudusky was asked to resign, Monari believed that those particular members "held a bias against women in positions of authority." Finally, Monari remarked that, in 2006, Ketchum, Hall, and Manock "regularly voiced complaints about Victoria Harper's accounting reports and her conduct of the Office of Treasurer."

Second, Mary Hampton, the County's Circuit Clerk since 1988, testified by deposition that whenever the County Clerk's salary was set higher than her salary, she would have to make a presentation to the Board in order to have her salary raised to the County Clerk's level. Hampton testified that male officers were not required to similarly justify their pay raises to the Board. However, she admitted that she had no "personal knowledge of whether the other elected officials appeared before the Finance Committee to explain why they needed a particular budget or salary increase … ." Hampton also testified that she felt that Hall talked down to her and Harper and adopted a more aggressive tone than when he was speaking to men. Finally, Hampton testified that in August 2008, when she requested a raise, she felt hostility when she was in the same room as the members of the Finance Committee, which at that time included Bucher, Hall, Ketchum, Manock, and Williams.

None of this testimony is direct evidence that the Board (or members thereof) denied Harper pay raises because of her sex. Thus, the question is whether this testimony is strong enough circumstantial evidence to allow a jury to infer intentional

discrimination by the Board—or, at least, a critical mass of the Board's members. We conclude that this testimony falls far short of that standard.

Monari's testimony includes nothing to suggest that the power struggle resulting in her ouster from the Chairmanship had anything to do with her sex. To conclude that it did would be raw speculation. Similarly, Monari fails to link Ketchum, Hall, and Manock's complaints about Harper's performance to her sex.[4] Furthermore, Monari's testimony that she believes that a critical mass of male Board members are biased against women is conclusory. And Hampton's testimony that male office-holders were not required to justify their pay raises is pure speculation in light of her admission that she lacked personal knowledge. Finally, Hampton does not offer any evidence linking her sex to her perceptions of hostility from the Finance Committee members during the August 2008 meeting to her sex.

All that remains is Monari's testimony that Ketchum and "other male members" of the Board asked Abudusky to resign but did not ask Manock to resign, along with Hampton's deposition testimony that Hall spoke more aggressively to her and Harper than to men. In some circumstances, "behavior toward or comments directed at other employees in the protected group" can be one kind of circumstantial evidence indicating discrimination. *Good v. Univ. of Chi. Med. Ctr.*, 673 F.3d 670, 675 (7th Cir. 2012) (quoting *Darchak v. City of Chi. Bd.*

---

[4] Indeed, that testimony is consistent with the County's contention that it did not give Harper pay raises due to her poor work performance.

*of Educ.*, 580 F.3d 622, 631 (7th Cir. 2009)). But Harper offers no evidence that these "other male members" (whom she fails to identify) were still on the Board in 2010 or, if so, voted to deny her pay raises. *See id.* at 676 ("The direct method of proof … requires evidence leading *directly* to the conclusion that an employer was illegally motivated, without reliance on speculation."). Similarly, even supposing this evidence were enough to establish that Ketchum and Hall held biases against women, Harper has failed to link those alleged biases to the decision to deny Harper pay raises. *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003) ("'[B]igotry, *per se,* is not actionable. It is actionable only if it results in injury to a plaintiff; there must be a real link between the bigotry and an adverse employment action.'" (quoting *Gorence v. Eagle Food Ctrs., Inc.*, 242 F.3d 759, 762 (7th Cir. 2001))). This is especially so given that neither Ketchum nor Hall were on the Finance Committee when the recommendation was made.

In other words, the testimony does not lead "*directly* to the conclusion that" the Finance Committee's recommendation and the Board's vote to adopt that recommendation were based on Harper's sex. *Good*, 673 F.3d at 676. And even if the testimony had some circumstantial relevance, the totality of Harper's evidence is simply insufficient to establish intentional sex discrimination.

## B. Indirect Method

Under the indirect method, also known as the *McDonnell Douglas* burden-shifting approach, Harper "must establish a prima facie case of sex discrimination by producing competent evidence that (1) she is a woman, (2) she suffered an adverse

employment action, (3) she was meeting [the County's] legitimate business expectations, and (4) a similarly situated man was treated more favorably." *Weber v. Univs. Research Ass'n, Inc.*, 621 F.3d 589, 593 (7th Cir. 2010). If she does so, the burden shifts to the County to articulate a legitimate, non-discriminatory justification for denying Harper pay raises. *Id.* Once the County offers such a justification, the burden shifts back to Harper to show that the justification is simply a pretext and that her sex was the real reason she did not receive pay raises. *Id.*

Here the parties focus on whether the County's justifications for denying Harper pay raises are pretextual.[5] The County offers seven justifications for denying Harper pay raises. First, Conklin, Huggins, and Hall testified that they believed Harper should not receive pay raises because of an incident wherein the Illinois State Police investigated Harper for requesting a check from the County's General Fund for "supplies" even though the check was to reimburse herself for money she had donated to the County in the early 2000s. Second, Bucher, Conklin, and Hall testified that they believed that Harper did not work full-time. Third, Bucher, Conklin, Fletcher, Huggins, and Hall testified that they believed that Harper could have chosen better investments but refused to do so or work with the Finance Committee with respect to the County's investments. Fourth, the County asserts that on two different occasions Harper did not provide reports requested

---

[5] The denial of a raise—even a purely discretionary one—can be an adverse employment action. *Hunt v. City of Markham, Ill.*, 219 F.3d 649, 654 (7th Cir. 2000).

by the Finance Committee. Fifth, Harper sued the County in state court in an effort to overturn a Board resolution directing that the County Administrator be given "read only" access to the County Treasurer's reports. Sixth, Harper often did not provide monthly reports to the Board members until after the Finance Committee met and shortly before the Board met. Seventh, Harper did not assist with the County's budget and often did not attend Finance Committee meetings.

Harper has utterly failed to come forward with evidence tending to prove that the County's numerous justifications for denying her pay raises are pretexts masking sex discrimination[6]. Harper does contend that the testifying Board members were mistaken about a number of the accusations they level against her. But so long as these accusations were sincere, it does not matter whether they were wrong. *See*

---

[6] Harper argues that the Board was not legally permitted to deny her raises on the basis of her work performance. Harper relies upon an Illinois Supreme Court decision referencing that "if one is lawfully entitled to a public office the right to salary attaches to the office and that it may be recovered in full, irrespective of any service rendered … ." *Kelly v. Chi. Park Dist.*, 98 N.E.2d 738, 741 (Ill. 1951). But *Kelly* is concerned with whether a public official is actually being paid her full salary—the decision does not concern an authorized body's initial decision about what the public office's salary should be. At the May meeting, the Board set the salary for the four-year term commencing in December 2010. Because the elections for that term had not yet occurred, neither Harper (nor anyone else) was "lawfully entitled" to the office of County Treasurer for the December 2010 term. Moreover, apart from imposing minimums not at issue here, the Illinois Counties Code imposes no substantive limitations on the Board's power to set the salaries of certain County officers prior to the commencement of their terms. *See* 55 ILCS 5/4-6001.

*Ballance v. City of Springfield*, 424 F.3d 614, 621 (7th Cir. 2005) (observing that a plaintiff cannot prevail if the employer "honestly believed in the nondiscriminatory reasons it offered, even if the reasons are foolish or trivial or even baseless" (quoting *Bell v. E.P.A.*, 232 F.3d 546, 550 (7th Cir. 2000))).[7] Moreover, Harper concedes that many of the accusations were true, but contends that the problems were not (entirely) her fault. For example, Harper argues that she did not write the check giving rise to the state police investigation, she did not have the technical ability (or, at least, the time) to generate the requested reports, she was not obligated by statute to assist with the budget or attend Finance Committee meetings, and the Finance Committee's investment views wrongly valued high interest rates over liquidity. However, the fact that some of the criticisms leveled against Harper may not be completely fair does not establish that they are pretextual.

Harper's only attempt to show pretext relates to the lawsuit she filed against the County in resistance to the Board's resolution directing that the County Administrator be given "read only" access to the County Treasurer's reports. Specifically, because County Counsel represented the County, the state court appointed a special attorney to represent Harper, but who was to be paid by the County (pursuant to

---

[7] As *Ballance* makes clear, there is no merit to Harper's contention that "[t]his court has not addressed the question of whether proof [of] the falsity of the employer's stated reasons for the employment action is all that is required to survive summary judgment." Showing that the proffered justifications were mistaken is not enough; to establish pretext a plaintiff must show that the employer is lying when it claims that the justifications were the real reasons for the adverse employment action.

Illinois law). However, the Board resisted the efforts of Harper's attorney to collect his fee for about one and one-half years. Harper contends that the Board's reluctance to pay her attorney's fee interfered with his ability to attempt to negotiate and reach a settlement, which shows that the Board was not genuinely interested in ensuring that the County Administrator obtained access to the County Treasurer's reports.[8] But Harper's attorney was appointed for the purpose of aiding Harper in the lawsuit that she brought in order to oppose the Board's demands. It is not reasonable to infer from the Board's reluctance to pay for the services rendered on behalf of Harper's opposition to the Board's demands that the Board was not concerned with Harper's compliance with those demands. Indeed, as the County has stated, Harper's decision to bring the suit was one of the County's justifications for denying Harper pay raises. Regardless, Harper still has completely failed to come forward with evidence that the County's other six justifications are pretextual.

Harper also complains that the Board treated Nelson, a male, better than her by giving him pay raises. But the County explains that the Board adopted the Finance Committee's recommendation to give Nelson (the County Clerk) pay raises for the term commencing in December 2010 because of his particularly excellent work performance. The County points to evidence that Finance Committee members believed that Nelson went beyond his normal duties and worked overtime (including on weekends during the election process). The County offers evidence that Nelson helped the County save

---

[8] The parties do not tell us the outcome of the state litigation.

about $160,000 in health insurance premiums. The County also offers evidence that Finance Committee members believed that Nelson had improved the equipment, processes, and efficiency of the election process, had guided the County through a major information technology upgrade, and had spearheaded the County's efforts to establish a geographic information system. Harper offers no contrary evidence. Thus, in addition to the complaints about her work performance, the County has offered undisputed and legitimate reasons for giving pay raises to Nelson but not to Harper. And Harper offers no evidence that these reasons are pretexts masking sex discrimination.

Finally, Harper points out that much of the County's evidence regarding its justifications for denying her pay raises (while giving them to Nelson) comes from the testimony of individual Finance Committee members and other Board members. Harper contends that this evidence is irrelevant because it does not necessarily reflect the views of all ten Board members who voted to deny her pay raises. Of course, any rule that only evidence reflecting the views of all of these ten Board members is relevant would not bode well for Harper's theory that only *some* of those Board members (a critical mass) were motivated by biases against women. In fact, the testimony of the individual Board members regarding why they voted to deny Harper pay raises is certainly relevant to whether that decision was the product of sex discrimination. Similarly, because the Board merely voted to adopt the Finance Committee's recommendation to deny Harper pay raises, the Finance Committee members' reasons for making that recommendation shed light on the Board's ultimate decision to adopt that recommendation.

Moreover, at the May 11, 2010, meeting, the Board adopted three resolutions concerning the content and timeliness of the Treasurer's reports. Harper concedes that these resolutions demonstrate that the Board was concerned about the content and timeliness of her reports when it voted to deny her pay raises. But, as explained above, Harper has failed to show that the Board's concerns about the content and timeliness of her reports were merely excuses covering sex discrimination. Thus, even if we were to confine our review of the Board's justifications to its concerns about the content and timeliness of Harper's reports, Harper cannot establish pretext.

### III. Conclusion

Because, as a matter of law, Harper cannot establish sex discrimination under either the direct or indirect method, we AFFIRM the judgment of the district court.